Mr Justice Baldwin delivered
 

 the opinion of the Court;
 

 The land in controversy is claimed by the United States, in virtue of the treaty of cession by Spain, by which .the territory and sovereignty of the two Floridas were acquired,' in consideration of 5,000,000 dollars, paid in extinguishment . of certain claims of- the citizens'of the United' States' on the-government of. Spain. Colin Mitchel claims, by-deeds from" various tribes of Indians belonging to- the great Creek confederacy, to Panton, Leslie & Co;,'to.John Forbes & Co., and to John Forbes, confirmed by the- local authorities of Spain, whose right has' become vested in him by sundry mesne conveyances, 'to which it is unnecessary ■ to refer, as the regular deraignment of Whatever title was vested in the original grantees to the present claimants is not'questioned. (Recofd .362.) The lands are in four .separate tracts, extending from the-mouth of the river St Mark’s, outside of. the isjands along the sea. coast, to the west end of St Vincent’s island, west of the mouth.of the rivér Appalachicóla; thence to that river about five miles from its mouth, up the same for many miles ; thence by a back line-.to a point on the western bank of the St Mark’s above the old fort of that name, and down the said river to the sea. It iá unnecessary to refer to the boundaries of the separate tracts, or the particular designation of the lines and points of the whole body of lands, as they are not a subject of controversy in this case; the quantity, as estimated by the claimant, is one million two hundred and fifty thousand acres (Record 5.);' and by the Spanish officers, one million three hundred' and ninety-one thousand arpents. (Record 224.) The history of the claim is this.
 

 
 *726
 
 The commercial house of Panton, Leslie & Co. had long been established at St Augustine, in east Florida ; it had extensive connexions and great credit in England, and its operations were very great. After Spain- had taken possession of the Floridas, in virtue of the-treaty of peace in 1783, the king, by a royal order, gave them license to carry on and continue their-commercial operations in ihose proy.ineesmnd Louisiana.’ (Record 164— 167, 236 — 2S1, 157 — 160.) As they were an English house, an oath of allegiance was required, which was taken by Mr Panton, (Record 127; 128) and by Mr Leslie, for himself and the other members of the firm who were not in the province.(Record 275,.281, 282) in 1756, with which the Spanish government was satisfied, as a compliance with the royal orders of the same year. , (Record 160 — 164).
 

 This house conducted-its affairs to the entire satisfaction of the successive govcrnors-general of Louisiana (Record 120— 129) and the local authorities of the Floridas, rendered important services to the crown, met with many and great losses, amounting, by the estimate of the marquis óf Casa Calvo, then , governor-general of Louisiana, in 1800, to 400,000 dollars. (Record 125,136, 147, 148.) Five of- his predecessors had recommended the. awarding some indemnity to the house; they had .made repeated claims upon the. crown, the justice of which had been acknowledged by all the local authorities during all the changes of administration (Record 121, 122, 132, 133, 134), in their numerous despatches .to the ministry, which had been submitted to the king. (Record 130, 374.) They concurred'in representing to the king the great-importance and services of the house as a political instrument of the government-; that-they had a right to-indemnity from the king; that the'situation of the house was-such, that they must sink under their losses if it was not afforded ; and that it must be sustained and preserved as indispensable to- retain any control'over the Indians, and’.sécufe lhe possession of the provinces entrusted to their care. (Record-130, 139, 143 — 152, 151, 252 — 257, 302, ASO.)
 

 . In consequence of .the repeated solicitations of the house to the king for compensation, a royal order was .directed to. the captain-general of-Cuba on. the subject of the indemnities proper lo be given them; in reply to which, among other propon sitions made by-the governór-general of Louisiana, was a grant
 
 *727
 
 of twenty leagues square of royal lands west of the Mississippi, ora loan of 400,000,dollars-without security. (Record 144, 145.) This shows the sense .of .that high officer of the value of the services of the house,, the extent, of their losses ini their exertions in-favour of the government, With the measure of remuneration which he considered to bé due of right in 1800. (Record 144,147.)
 

 Amongi the losses sústained by. the house, was: a large amount due by the Seminole Indians prior to 1800 ; and for robberies of their stores in 1792 and Í800, by members of that tribe, headed by the celebrated adventurer Bowles, exceeding in all 60,000 dollars (Record 22 — 28); of which they were unable, to procure any payment from the Indians, but who-had expressed a willingness.to make compensation by agrant of their lands.
 

 Early in 1799 the house made an application-to the governor-general, of Louisiana for leave to purchase from the Indians as much land as would satisfy the above claims, which 'was favourably received by both him and his successor. (Record 54, 56.) Negotiation with the Indians was followed by a deed of cession from them, in 1804, of. the large tract containing' one million two hundred thousand arpents, (Record 554.)
 

 This deed was confirmed at a general council of the nation and its chiefs held at Pensacola in 1806, in the presence of Folch, governor of West Florida'(Record 568, 584, 590, 614), in all the. form and solemnity which Indians could give it.. This governor had previously given leave to make'the purchase on a petition presented to him by the house in January 180.4, setting forth the circumstances of the case; which was granted on only one condition, that they should not dispose of the lands without notice to and knowledge of the government; and in December 1806, gave his full confirmation to the grant.óf the Indians made to Panton, Leslie & Co. (Record 58, 84.) Another application was made to the same governor in 1807, for his permission to make ah additional purchase, from the same Indians, which was' granted in December 1810, on condition that the house should cede the whole or part of the lands to the king, if he should want them, at'the price at which they acquired them, and not dispose of them without notice to the government.. (Record 273, 274, -275.) In the following
 
 *728
 
 year the Indians granted the other tracts.between the rivers Wakulla and St Mark’s, including the fort, which was also confirmed by the governor (Record 606), at a great public council of the Indians at'Pensacola; this tract contained by estimation ninety-seven thousand arpents. At the same time another tract
 
 on
 
 the sea coast, including some islands at and west of the mouth of the Appalachicola, was in like manner granted by the Indians and confirmed by the governor to John Forbes & Co., thesuccessorsof Panton, Leslie & Co. (Record 106) containing sixty-five thousand arpents. At the same time and place there was granted and confirmed tó John Forbes an island in the Appalachicola, containing six thousand eight hundred arpents, for which no consideration was paid; the grant being a gratuity by the Indians to' Forbes, in consideration of his services and friendship rendered and shown to them for years before. (Record 217 — 224.) It.is hot deemed necessary to-recite more specially the various original deeds from the Indians, or those made in councils after the lines had been marked which designated the boundaries of the respective grants, ñor the grants of the governor of West Florida, confirming them by titles in form delivered to the parties ; they are in form and. ■substance alike (Record 28 — 106, 430, 447), and no question has arisen on their terms.
 

 Those of the Indians recite the considerations which led to the grants, convey the lands with a warranty of their title by ascertained boundaries (Record 39, 40, 49, 91, 95, 86, 93, 69, 82 — 84, 29 — 36, 59, 63, 95 — 108, 562); those of the governor ratify and confirm the grants in full and direct dominion (Record 37, 49, 91, 95, 111) and in full property, put the grantees in possession, and promise to defend and maintain it, (Record 106, 137, 145) all of which he declares is done by using the powers vested in him. (Record 75 — 91,30—37, 99,233,234.) They are drawn up in great form; contain a perfect recognition of the Indian-grants, and’ give to them all the validity which he could impart to them. (Record 106, 131, 175, 191, 193.) They are made in the name’of the king, executed and attested in all due formality; and their authenticity proved, as public documents, and by the testimony of witnesses to the ofBcial signatures. (Record 562,579, 615, 620, 623, 646, 611, 612, 613 — 626). The claims of the house upon the Indians
 
 *729
 
 for debts due since 1789 and depredations committed, were notorious to the government and inhabitants of Pensacola, (Record 273, 274, 536, 590) as were the purchases; and their confirmation-by the Indians, at which two thousand are ■computed to have attended in. 181,1 (Record 592, 601), is proved as a'facf by witnesses present in the different, councils; so is the fact of the latification by the governor. (Record 579, 614, 615, 620, 623, 646;) The original deeds, and the de-, marcafion of lines and boundaries wete made (Record 42,
 
 43,
 
 100, &c.) in the presence of tl,te commandant, at St Mark’s, (Record 73, 97, 104, 108), exercising the offices of lieutenant governor and,subdelegate of the iiiténdancy, or were approved by him: every act done in relation to the cessions and their ratification, from the first application to the governor-general in 1799 to their consummation in 1811, was public and notorious to both Indians and whites. (Record 590.) Governor Folch reported all his proceedings to the captain-general of Cuba, by whom they were approved, who declared that-the king would confirm them, and, as.some of the witnesses say, declared that he had ’ confirmed them. (Record 228, 229, 232, 568, 572, 584, 594.) From the time of the first cession in 1804, the Indians acknowledged the validity of the grant's, were satisfied with them, called the land thq white land, or the land of the whites, (Record 606) asked permission from the house to hunt upon theni, and with the exception of some oc-casonal depredations, respected their possessions and oroperty. ' (Record 619 — 621; 623.) Their title too. was equally respected by the local government, and all the officers ■ of the. king (Record 234, 574, 624 625):-nor from him to the lowest .does there appear to have been expressed any dissatisfaction at any-of the acts of governor Folch, or the'least doubt of the perfect validity of the title; though the claim of the-house to the whole land conveyed was perfectly known and evidenced by a partial actual possession, taken at an early-period and continued till the cession of the provinces. (Record 620, _ 624, 625.) There is no evidence in the record, that either the Indians, the governor, or intendant ever made a cession, grant, order of survey, or gave permission to settle within the boundaries of any •of the grants. It is also a circumstance of no small consideration, that notwithstanding the long and inveterate controversy
 
 *730
 
 between the governor and intendant about their powers to grant lands even in small tracts, there was none in relation to these. Yet the intendant had full notice of them, spoke of them, but made no objection'(Record
 
 571)
 
 or preferred any complaint
 
 to
 
 the captain-general or the king, although the quantity of land thus granted to this house was nearly double to the whole amount of the grants of royal lands made' by-the' government of West'Florida. (Record 421, 469.) It was alsc proved, that in the opinion of those who know.the land, as Well as the officers of government, it was mot worth, at the time, the amount of the just claims of the house on the Indians; that the grants were taken as the only means of their indemnification, and that the purchase was much less advantageous to them than to the king, who thereby became absolyed from a claim not only too just to deny, but too large to satisfy with convenience. (Record 570-^-574,579, 556, 573, 625;) It is also proved, that the Indians who made the cessions occupied the lands for hunting grounds; were deemed the owners of them as Indian lands, and had three settlements upon them previously, (Record 559, 565, 576, 585) and that the country was claimed by the Seminóles. (Record 12,52, 607.)- The lines were marked by persons appointed by the governor in presence of the Indians, who consented to them, (Record ,621 — 623, 632) and the governor gave formal. possession to the house (Record 625) ac-. cording to the plats of the several"*grants exhibited to him» which the witnesses declare to have, corresponded with the lines marked upon the ground, and those recited in the deeds and petitions. (Record 623.)
 

 Iii-opposition'to this mass of documentary and parol testimony, in support of the allegations of the petitioners, that the grants were in fact made and confirmed, in the manner, and for the reasons and considerations set forth, no direct evidence appears in the record. Some of the witnesses.were examined as to the supposed influence of the house with governor Folch, but the imputation was negatived, and the proceedings through-' Out declared to have been in good faith. (Record 554 — 583.)
 

 So far then as the merits of the case depend on the genuineness of "the- deeds and docunients, the facts of the grants and confirmations by the Indians and governor, , the marking the lines and possession of the land, the good faith of the whole
 
 *731
 
 transaction, the absence of fraud, the authority of the Indian chiefs, as representatives of their respective tribes, we entirely concur in opinion with" the court below-. That the grants were made bona fide, for a valuable consideration, of the adequacy of which the Indians were competent judges, if they had any right, in the lands which they could convey; that the ratification of the governor was fairly and fully made, and for good and sufficient reasons, of which he was the judge, if he had competent authority to give effect and validity to Indian, cessions of the land in controversy. The view which' the learned judge took of these questions, after a thorough, searching examination of the documents and evidence, is so entirely satisfactory, that we have only to 'express our ¿ssént to the conclusions at which he arrived. (Record 662 — 669.)
 

 There is, however, one subject which was considered by him, into which we do not feel at liberty to inquire, which is the-.water-mark in the paper on which the governor’s permission of the 7th of January 1804, was written, noticed and commented on, at large by the judge. (Record 706.) This objection was not made in the court, below, at the hearing, or in the argument, so that no opportunity was afforded to the petitioner tp produce any evidence on the subject, or to his counsel to answer the objection. This court also refused to grant him a commission to take testimony to explain and-account for the water-mark, or permit him to read the ex parte evidence offered to explain it; because in an appellate court no new evi7 dence could be taken or received without violating the best established rules of evidence and law. Under such circumstances, it would be dealirg to the petitioner a measure- of justice incompatible wi.th every principle of equity, to visit upon his title an objection which he was not bound to anticipate in the court below7, which he-could not meet there, and which this court were.- compelled to refuse him the means of removing by "evidence. We will not say what course would have been taken if* his title had depended on the date of the paper alluded to; as the case is, it is only one of numerous undisputed documents tending to establish the grant, the validity of which is but little, if it could be in any degree affected by the date of the permission.
 

 It is objected by the counsel of the United States, that the
 
 *732
 
 original acts of confirmation of the Indian sales by governor Folch are not produced, and that the. copies in- evidence are not legal'-proof of such acts. This objection seems to us hot to • be. well founded in fact or law. The original Indian deeds were procured by the agent of the United States from the public archives in Havana (Record 529, &c.) and are now before us. The deeds of confirmation were made according-to the rules of the civil law adopted by Spain, and in force in Florida and.
 
 Cuba;
 
 the original is a record, and preserved in the office, which, cannot be taken out; a testimonio or copy is delivered to the party, which is deemed to be and is certified as an original paper, having all the effect of one in all countries governed by the civil law. Such is provéd to be the law of thofee. colonies, as a fact, by Mr White (Record 628); such is the. form of the certificates in this case, varying in phraseology somewhat, but agreeing in substance and effect (Record 19, 38, 45, 50, 58, 91, 106, 111), in perfect accordance with the civil law adopted in Louisiana, and recognized by this court in 'the case of Owings v. Hull,. decided at the present term. We therefore consider those now-produced as original deeds of ■ confirmation by the governor, duly certified and proved.
 

 It is,objected, tjiat the’deeds of 1804 and Í806, to Panton,• Leslie & Co. were inoperative to pass the lands, they haying died previously.
 

 It is in proof as a fact that Forbes & Co. were the successors in business ancf interest to Panton &_Co. This change of the name and partners of the house after the death of Mr Pan-ton was known to the officers of the local government and the king; who b’y a roy.al order in 180.5, (Record 262). and another in 1807, (Record 270) directed that it. should have no effect on their privileges. To the king it'mattered not whether the lands were conveyed to the house-as a firm, or to tlie partners nomination they, it seems, preferred considering the lands as a part of the general-effects-of the partnership, and received ■the deeds accordingly ; as it concétned only (hem,¿ind as there • has been produced no law of Spain invalidating such a grant, the objection cannot be sustained.
 

 Another objection^ on account of ah oath of allegiance not.
 
 *733
 
 having been taken by the grantees, is removed by the evidence ' already referred to, and need be no further considered.
 

 It is objected that the grant of 1811 is invalid, because.it comprehends the fort of St Mark’s, then actually occupied by the troops of the king. It is in full proof that.the site of St Marks and the adjacent country was within the territory claimed by the Seminole Indians (Record 12, 131, 603 — 607, 618.). It is not certain, from the evidence, whether it was pur-, chased from the Indians, or merely occupied by their permission : there seems to be no written evidence of the purchase,, but no witness asserts that possession was taken adversely to the Indian claim, and it is clearly proved to have been amica‘bly done. (Record 232, 306, 581.) Whether the Indians had a right to grant this particular spot then or not, cannot affect the validity of the deeds to the residue of the lands conveyed in 1811. The grant is good, so far as it interfered with no prior right of the crown, according to the principles settled by this court in numerous cases arising on grants by North Carolina and Georgia, extending partly over the Indian boundary, which have uniformly been held good, as to whatever land was within the line established between the state and the Indian territory. Wear v. Danforth, 9 Wheat. 673; Patterson v. Jenckes, 2 Peters’s Rep. 216; and Winn v. Patterson, decided by the supreme court of the United States, January 1835, ante 663. As to the land covered by the fort and appurtenances, to some distance arouftd it, it becomes unnecessary to inquire into the effect of the deeds, as the counsel of the petitioners have, in open court disclaimed any pretensions to it.
 

 Another objection is of a more general nature, that the grantees did not acquire a
 
 legal
 
 title to the lands in question. But it must be remembered, that the acts of congress submit these claims to our adjudication as a court of equity ; and, as often and uniformly construed in its repeated, decisions, confer the same jurisdiction over imperfect, inchoate and inceptive titles as legal and perfect ones, and require us to decide by the same rules on all claims submitted to us, whether legal or equit- ’ able.
 

 Whether, therefore, the title in the present case partakes of the one character or • the other, it remains only for us to inquire whether that of the petitioner is such in our opinion that
 
 *734
 
 he has, either by the law of nations, the stipulations of any treaty, the laws, usages, and customs of Spain, or the province in which the land' is situated, the acts of congress or proceedings under them, or a treaty, acquired a right which would have been valid if the territory had remained under the dominion and in possession of Spain.
 

 In doing so, we shall not take a detailed review of the leading cases on Spanish grants already decided by this court, in relation to those lands which formed a part of the royal domain, in contradistinction to those which may be considered as Indian lands claimed by Indians, by their title, whatever it may be. Those comprehended within the claim of the petitioners being. of the latter description, as they contend and thereupon rest their title, if will suffice to state some general results of former adjudications which are applicable to this case, are definitively settled, so far as the power of this court can do it, and must be taken to be the rules of its judgment. They are these :
 

 That by the law of nations, the inhabitants, citizens, or subjects of a conquered or ceded country, territory, or province, retain all the rights of property which have not been taken from them by the orders of the conqueror,, or the laws of the sovereign who acquires it by cession, and remain under their former laws until theyshall be changed.
 

 That a treaty of cession was a deed or grant by one sovereign to another,-which transferred nothing to which he had no right of' property, and only such right as he owned and could convey to the grantee. That by the treaty with Spain the United States acquired no lands in Florida to which any person had lawfully obtained such a right by a perfect or inchoate title, that’ this court could consider
 
 it' as properly
 
 under the second article, or which had, according to the stipulations of the eighth, been granted by the lawful authorities of the king; which words
 
 grants
 
 or
 
 concessions
 
 were to be construed in their broadest sense, so as to comprehend all lawful acts which operated to transfer a right of property, perfect or imperfect. 6 Peters 710; 7 Peters 86, 88; 8 Peters 445, 449, 450, 486.
 

 That the effect of the clauses of confirmation of grants made was that .they confirm them presently-on the ratification of the treaty, to those in
 
 possession
 
 of the lands, which was declared
 
 *735
 
 to be; that legal seisin and possession which follows a title, is coextensive with the right, and continues till it is ousted by an actual adverse possession, as contradistinguished from residence and occupation. 6. Peters 743 ; 8 Cranch 229, 230; 4 Wheat. 213, 233; 4 Peters 480, 504, 506 ; 5 Peters 354, &55.
 

 That the United States by accepting' terms of the eighth article, and the ratification by the king, with an exception of the three annulled grants to Allegon, Punon Rostro, and Bargas, can make no other exceptions of grants, made by the lawful-authorities of the king. 8 Peters 463, 464.
 

 That the meaning of the words •
 
 lawful authorities
 
 in the' eighth atticle, or
 
 competent authorities
 
 in the. ratification, must, be taken to be
 
 “ by
 
 those persons who exercised the granting power by the authority of the crown.” That the eighth
 
 o'
 
 tide expressly recognizes the existence of these lawful autl «litres in the ceded territories, designating, the governor or iniendant, as the case might be, as invested with such authority, which is to bé deemed competent till- the contrary is made to appear.. 8 Peters 449 to 453.
 

 That “by the laws of Spain” is to be understood the will of the king expressed in his orders, or by his authority, evidenced by the acts themselves, or by such usages and customs in the' province as may be presumed, to have emanated from the king, or to have been sanctioned by.him, as existing authorized local. laws. 6 Peters 714 to 716.
 

 In addition to the established principles heretofore laid down by this court as to the legal effect of an usage or custom, there is one which is peculiarly appropriate to this case. The act of congress giving jurisdiction to this court to adjudicate on these causes, contains this clause in reference to giants, &c., “which was protected and secured by the treaty, and which might have been perfected into a complete title, under and in conformity to the laws,
 
 usages
 
 and
 
 customs
 
 of the government under which the seme originated.” 6 Peters 708, 709; 3' Story’s Laws 1959, 1960.
 

 This is an express recognition of any known and established usage or custom in the Spanish provinces, in relation to the grants of land and the title thereto, which brings them within a well established rule of law. That a custom or usage saved
 
 *736
 
 and preserved by a statute has the force of an express statute, •and shall control all affirmative statutes in opposition,', though it must yield to the authority of negative ones, which forbid an act authorized by a custom or usage thus saved and protected ; 4 Co. Inst. 86, 298'; and this is the rule by which we must test its efficacy according to the act of congreés, which we must consider as of binding authority. ■
 

 In taking possession of Florida pursuant to'the treaty, and in establishing a government in and over it, congress have acted on. the same principles as those which were adopted by this' court in the former cases. In the act of 1821, for carrying the treaty into-execution, congress authorizes the vesting the whole power of government in such person as the president may direct for the
 
 maintaining the inhabitants in the free enjoyment of their property.
 
 Pamphlet Laws.47.
 

 The governor thus appointed, by his proclamation in' the same year,- announces to the inhabitants that he has beett invested with all the powers, and charged with' all the duties heretofore held and exercised by the captain-general and of the jntendant of the island of Cuba over the Floridas; and the governor thereof.; recites the foregoing act of congress, declares that they shall be maintained and protected in the free enjoy-merit of their property, &c., and that all laws and municipal regulations, which were in existence at the cessation of the late government remain in full force. Pamphlet of 1822,113.
 

 ■ The tenth section of the act of 1822 contains the same pledge for' the protection of property, and the thirteenth continued in force the existing laws, till altered by the local legislature then organized. Pamphlet 15.
 

 The'formal act of the surrender of the Floridas by Spain to the United States was made by the commandants of both of the provinces, by the authority, of the captain-general of Cuba under a royal order. Pamphlet 110.
 

 These are most solemn acts of both governments, which, as the. proceedings under the treaty of cession, are made a rule for our guide in deciding on the validity of the title to lands in the provinces; they have all been ratified and approved by the king and congress, affording the highest possible evidence of the True meaning of both the high contracting parties to the treaty. They point directly to the kind of government
 
 *737
 
 which existed before the cession as general and intendant of Cuba, and the governors.of the provinces, as the supreme legislative, executive, and judicial power, subordinate to' the king only. And as it became after-wards in the hands.of the governor alone by act of congress subordinate only thereto, while under both, the government was administered in conformity to the local laws and municipal regulations. It cannot therefore bé doubted that among the other powers of the former government* that of granting lands was invested in some of its officers,'nor that.such officers were the governor, the intendant, or captain-general, as the case might be; thus exhibiting a union of opinion between the king of Spain as well as'the legislative and judicial, departments of this government, ag to the meaning of the treaty, which cannot be without its influence on its true construction and bearing on the rights of parties now before this court: sitting in an appellate .court of equity, directed to decide “ in conformity to the principles of justice” and the laws .and ordinances of the government under which the claim of the petitioner originated, they must be our guide.
 

 Colin Mitchel claims the land in controversy as a purchaser •fiom Panton, Leslie . & Co., .John Forbes & Co., and John Forbes, who were purchasers from the Seminole or Tallapoosa Indians, bona fide, for a valuable consideration paid by one party, and received by the other by force or contract, accompanied with the legal seisin and .possession of the whole, and actual
 
 pedispossessio
 
 of a part, under a claim of right and title to the whole by grant. The equity of the parties from whom Mitchel purchased commenced in 1789. 1790, 1795, when the depredations were first committed and the debts contracted which formed the consideration of the Indian deeds, the debts increasing till 1800, and the depredations then renewed. A claim early made on the Indians for compensation and on the ' government of Spain lor indemnity, continued, till an agreement for the '-.ssion of lands by the former was made in 1800, andxavned into effect in 1804 and 1808; when it was carried into grant, ratified and confirmed by ihe Indians, the governor of West Florida, and captain-general of Cuba, without an interfering claim till the cession to the United States in 1820, 1821. On the other hand, the United States claim the land
 
 *738
 
 Dy purchase from the king of Spain, made bona fide, for a valuable consideration fully paid, but. with full and direct notice of the equity of Forbes & Co., and the purchase in the name of Panton, Leslie & Co., of which Forbes was partner, which notice was as early as 1804 (Recoid 283, 286, 290, 291, 568). The earliest equity claimed by the United States was in January 1818,- when the cession was first proposed; the'first agreement to convey by Spain was in 1819, the date of the treaty; and the final grant was made in 1820, the date of'the ratification ; and possession first taken in 1821, pursuant to the conveyance of the treaty.
 

 Thus viewing the contending parties, we proceed as a court of equity to inquire, whether at the time the cession by the treaty took effect in favour of the United States there was a right of property in Colin Mitchel to the lands included in his grants, or whether they had been previously granted- by the lawful authorities of the king. That they were granted in fact is incontestable; and they were private property, if there, was a grant competent by law to vest a title.
 

 It is contended by the United States that theacts of governor ' Folch, in the permissions to purchase from the Indians, and the ratifying and confirming their deeds, are void, as the lands were not in West Florida, over which province alone he had any jurisdiction.
 

 There seems no doubt that under the British government the river Appalachicola remained the boundary between East and West Florida, as it was so established by the,proclamation of the king in 1763. (I Laws U. S. 444), but it does not appear that Spain had adopted it in administering the government of •those provinces by any royal order, or that such was a common opinion of the inhabitants ("Record 602 to-.604): 'on the contrary, it appears that so early as 1785, Don Galvez, then governor-general of Louisiana, .considered tire- district of St Mark’s' de Appalachy as a dependency of his government, and in 1686 placed it tinder care of the government of West. Florida, and ordevéd the establishment of a post there by a de-" Uichmcnt' from the garrison of Pensacola, which acts were approved by a royal order in March 1787 (Record 306, 197). Thésc orders were acquiesced in by the governor of East Florida,.who appears to have exercised no jurisdiction within that
 
 *739
 
 territory, or to the west of it,, after 1786 (Record 260). There is abundant evidence in the record that that post, the circum- ■ jacent territory, with what lies between it and the Appalachi-cola, was a dependency on, and subject to both the civil and military jurisdiction of the governor of West Florida, and was so considered by all-the officers of the government, the' captain general and the liing,. as appears'from many. documents (Record 163, 165, 167, 16S,- 189, 190,. 201,-202; 203,' 209, 227,'228, 234, 236,' -266, .267, 297,- 29S, 304). The fact of the exSTcise of jurisdiction over that territory by the governor • of West'Florida is also established by the concurring testimony of many witnesses, (Record 582, 600, 601, 602, 604) as is also the fact of its surrender by him to the United Slates as a part of the territory under his command. (Record 602; Laws of 1832, pamphlet-112.)
 

 . But evidence of the fact still more conclusive, and its most, solemn recognition, by both governments, is to be found in the formal act of surrendering the. sovereignty and possession of the province by Spain to the United Sítales. The governor of West Florida “ placed the commissioner of the United States in possession of the country; territories and dependencies of West Florida,' including the fortress tíf St Mark’s, with the adjacent islands, dependent on said province.” (White 198; Pamphlet Laws 112.) So it was accepted and is yet held by the United States, and so we. must consider it as understood by congress in the various laws passed since- the cession, and the proceedings therein authorized-under the treaty in reference to East and West Florida. . The boundary between them must b¿ taken to be that which existed under Spain from 1785 till' 1821, as incontestably proved, and most solemnly admitted by the United States, up to which the powers of the governor of West Florida, whatever they might be, could be exercised in their plenitude, both as a government de facto and a government de jure.
 

 . It becomes needless to inquire whether; after these solemn acts, it is competent for the United States to now contest the existence of such boundary ; it suffices for this case, that it is. abundantly established by all the evidence, which is uncontra-dicted, and that the lands in controversy are situated within West Florida, according to the boundaries recognised by both
 
 *740
 
 governments. - This objection cannot therefore be allowed ta prevail. It is.next' contendedT that the power to grant lands in West Florida.was not vested.'in the governor, but was.confided exclusively to the iniéndantthis is clearly proved to be the settled law of that province as to royal lands, which were the property of the crown, and is admitted by- the counsel of the petitioner.
 

 But the reverse is, we think, equally apparent as to Indian1 lands, until their right had been abandoned, and the land be- , come annexed to the royal domain by a process in the nature of an office at common law. (White 25, 40, 42, 79, 43, 47, 2- 5.) The relations between the Indians and the government of Spain, were considered as matters of the deepest political concern, in nowise connected with its fiscal operations; the commerce with. the Indians was, as a political instrument, entrusted exclusively to the governors, as clearly appears by their correspondence with each. other, the. captain-general of Cuba, and the ministry in the mother country, and regulated by royal orders. (Record 113 — 153)' with which the intendancy had nothing to do. (Record 151, 571, 579, 536,587,590 ; White 32.) •
 

 It was a part of the governor’s oath, as prescribed by. the laws of thelndies, “ that you shall take care of the Welfare, increase and protection of the Indians.” (Record 237.) -He was their protector, whose duty it was to-examine whether claims upon them were weil founded, and ifso, contribute by all possible means to their being paid, (Record 587) but not to lend his sanction, or allow the smallest injury to be done to them, (Record 571, 232.) The fact of the supervision of Indian sales of their land by the governors-of provinces and commandants of posts, in acts of confirmation and putting the pur- . chasers in possession, is very clearly-established by- the report of the land commissioners of the United Slates in Louisiana. (Record 325 — 333.) It was exercised by.Don Galvez, governor general of Louisiana, as early at least as 1.777, in confirming an Indian sale of the great Houma tract on the Mississippi-(1 Laws U. S. 551, 552, 554).; and there is no evidence that this power was ever entrusted to or conferred on any other officer, nor that it was ever exercised by any other..
 

 It was an authority expressly delegated to them by the laws, (White 232 — 234) and so reported'by the commissioners (Re
 
 *741
 
 cord 329)-; proved also as. a.fact by the former secretary of the province (Record 572) and Governor Folch (Record 231 — ■ 2'34). It cannot, indeed, be well questioned that the governors and commandants of posts were the appropriate officers .for these purposes, in the absence >of any évidénce of confirmations by inlendants, with positive evidence.of their approbation by the captain-general of Cuba, in making (Record 12) formal ■acts of confirmation without objection by the intendant-gene-ral of'Cuba, or by local intendant?. When to these considerations is added another, arising from the circumstance of there being no instance of the rejection or disaffirmance of a ■deed confirming an Indian sale by any of the superior authorities in the provinces,'or by the king, as is clearly established (Record 336, 627, 628) and admitted in the argument, we cannot feel authorized to declare that governor Folch usurped any powers vested in the intendant, in any of liis acts relating to these lands.
 

 The confirmation of similar grants made by acts of congress, or by boards of commissioners acting under their authority, are also powerful evidence of the lawful exercise of the authority of these officers; and being proceedings under the treaty and laws, they are made a rule .by which among others we may adjudicate on the claims of the present parlies, in doing which we cannot sustain this objection without overlooking such a concurrence of evidence of various descriptions, as leaves no reasonable cause of a doubt of the authority of governor Folch; especially when we connect with his first permission to make the purchase of 1804, the condition attached to it, that the lands should not be disposed of without the giving notice to and knowledge of the government; and to that of 1811, that it should be conveyed to the king, if required, at the price at which it was purchased, and the mode in which tliat-condition was performed and released.
 

 Pursuant to these conditions, John Fotbes- applied to the captain-general of Cuba, in 1817, for permission to sell the land to the petitioner, which being referred to the assessor-general for his advice, he reported that the landsjiad been transmitted actually and lawfully in full property-to Mr Forbes, with a conditional title, or “ titulo oneroso,” for which acquisition competent permission was given by governor Folch, who
 
 *742
 
 delivered titles of confirmation'
 
 subsequently;
 
 whereupon a -formal permission was given by the captain-general to make the sale, which was a direct approbation of all the proceedings authorized by that governor, as well as that he was the officer designated for-such purpose. (Record 12, 52, 53.) Such á confirmation by an officer subordinate only to the king, performed so long after the acts done by the governor of a province who was under the control of the captain-general, must be referred to his legitimate authority competent for the.purpose. It was done also on the deliberate advice of an officer respon.sible to the crown, which makes the presumption very strong, if not irresistible, that every thing preceding it had' been lawfully and rightfully done. (White 25, 40, 43, 47, 49.) This proceeding is in the nature of an inquest of office, in analogy. to thé writ of ad quod damnum, which by the common law precedes the grant of any. charter, license, or patent of the king, of any thing which may be injurious to his or the rights of others, on which an inquest is taken, on whose report the king acts, on the advice of the proper.officer or tribunal, makes the grant or withholds it, as advised. ■ (3 Bla. Com. 259; 17 Vin. Ab. 171, 176 ; 7 Day’s Com. Dig. 80.)
 

 The report of the assessor-general s’eems to have been acted. on as an inquisition at .common law, finding that there was no obstacle to the making use of the powers entrusted to the captain-generál. We should feel it to be an assumption of much responsibility to declare thaton the evidence in this record, and the law- arising upon it, that either of the officers referred to usurped powers not yested in them, or exercised them against or without the authority ofi.the king.
 

 The counsel of the United States pressed in argument the decision of this court in the case of Arredondo, as an affirmance of the right of the ■ intendant of the province, or of Cuba, to grant Indian lands. In that case the lands granted had been in the possession and occupation of thé Allachua Indians, and the centre of the tract was an Indian town of that name. But the land had been abandoned, and before any grant was made by the intendant a report was made by the attorney and surveyor-general on a reference to them, finding the fact of abandonment., on which it was decreed that the land had reverted to and become annexed to the royal domain.
 

 
 *743
 
 Considering this to be a judicial act in the nature of an inquest of office, and the decree of the intendant as making, the fact a res adjudícala, we did not feel at liberty to look behind it for the evidence on which it was-founded ; the consequence of which was, that by the judgment of a competent tribunal, the land was part of the royal domain, subject to the. disposition of the intendant. There is no-pretence of a similar proceeding having been had in relation to these lands, nor. could there wejl be in .opposition to the evidence in the record, especially the report of the assessor-general in 1817, that they were the lands of the Seminóles at the time of the cession by them and the confirmation by governor Folch. By the common law the king has no-right of entry on lands which is not common to his subjects; the king is put to his inquest of office, or information of intrusion, in all cases where a subject is put to his action ; .their right is the same¿ though the king has more convenient remedies in enforcing his. If the king has no original right of possession to lands, he cannot acquire it without office, found,so as to annex it to his domain. (2 Co. Inst. 46 ; Seville 8, 9, pl. 20 ; Hob. 347 ; Hardress 460 ; 7 Day’s Com. Dig. 77; Gilbert’s Ex, 109; 3 Bla. Com. 257; Fitz. N. B. 90 b.; 4 Co. 58 b.; 16 Vin. 552; 3 Co. 10, 11; 9 Co. 95, 96, 98 ; Hardress 51, 52 ; Plow. 236,
 
 486
 
 ; 1 Co. 42; 5 Co. 52 b ; Plow. 229, 230.) Such, toó, seems to be the law of Spain in the Floridas and Cuba, as appeared in the case of Arredondo, and as it must have been understood by the Spanish authorities, when they acknowledged the Indian right to lands in the harbour of Pensacola to be an existing one in 1816. • Nor is there any evidence in the record that their right ceased to be respected, or that lands wnich had been in their- possession becaine annexed to the 'royal domain, till some official proceeding, founded on the law of Spain, in the nature of an office by the common law, had taken place under the proper authority. (White 25, 40, 37.)
 

 The UnitedjStates have acted on the same principle in the various laws which congress have passed in relation to private claims to lands -in the Floridas ; they have, not undertaken to decide for themselves on the validity of such claims without the previous action of some tribunal, special or judicial. They . have not authorized an entry to be made on the possession of
 
 *744
 
 any person in possession, by colour óf a Spanish.grant or title, nor the sale of any lands as part of the national domain, with any intention to impair private rights. The laws which give jurisdiction to the district courts of the territories to decide in the first instance, and to this on appeal, prescribe the mode by which l&nds which have been possessed or claimed to have been granted pursuant to the laws of Spain, shall become a part of the national domain, which,, as declared in the seventh section of the act of 1824, is a “ final decision against any claimant pursuant to any of the provisions of the law.”
 

 Another objection is made to the title of the petitioner, on the allegation that by the treaty of Picolata between Great Britani'and the Creeks in 1765, the Indians had ceded all the lands in controversy between the sea and flow of the.tide, in virtue of which they became the property of the crown and passéd to Spain by the treaty of 1783.
 

 The fifth article of the treaty of Picolata, made to prevent encroachments on the lands or hunting grounds of the Creeks, stipulates that the boundary of the province'of East Florida “ shall be all the sea coast as far as the tide flows, in the manner settled with the great Tomachiches-by the English,” with all the country particularly described therein, which they grant and confirm to the king.
 

 As this refers to a treaty of compact made with this chief, its meaning must be sought in it, and unless something can be found there which will make the expression more definite than the general terms “ all the sea coast as far as the tide flows,” it will require great latitude of construction, as to an Indian cession, to extend it from the St Mary’s, around the peninsula of Florida to the mouth of the Appalachicola. The tract of country ceded' lies on the sea coast, east of a point formed by a line run from the source of the St John’s, which is its southern boundary; the western boundary is a line run from the junction of the Ocklawaugh with the St John’s northwardly to the St Mary’s, nearly parallel to the sea coast, at an average distance of about thirty miles west. It would be stretching the meaning of this treaty very far, to embrace within it an extent of, sea coast and contiguous land within the flow of the tide to it3 "whole extent, when the extent of the lands ceded west of a line from the mouth of the Ocklawaugh to
 
 *745
 
 the sea was,so small. Before we could dp it, it must appear to have been so previously settled between the English and Tomachich'és, as is referred to in the treaty of Picolata. From the account given in M’Call’s. history of Georgia, the treaty with Tomach.iches was held in 1733, and the cession of tibe sea coast was only between ..the. Altam.aha and Savannah, extending .west to the extremity of;the tide water.. (1 M’Call’s HisC 37.)
 

 As this is the act referred to, it must be taken in connexion with-the subsequent treaty to make it certain by the reference, ~ (6 Peters 739) which' entirely removes the objection, and ' shows the cessions of the sea coast to be confined to that part -which is between the St Mary’s and St John’s rivers.
 

 Th.e'report of the surveyor-general in 1817, is very full on the subject of the boundaries between the British government and. the Indiana in East and West Florida. (Record .184— 194.) . He says, “ with regard. to East Florida, I have never been able to discover that there has. ever bee'n any treaty or agreement with the natives of that province concerning the limits of their possession, nor in that of the Spanish authority.” As the surveyor-general had referred to the treaty of Picolata in his report, it is clear that it was construéd by the Spanish government as it now is by this court.
 

 We now.cpme to consider the.nature and extent of the Indian (itle to’ these lands.
 

 As Florida was for twenty years under the dominion of Great Britain, the laws of that country were in force as the rule by which lands wé.re held and sold; it will be necessary to examine what they.were as applicable to the British pro-winces before the acquisition of the Floridas by the. treaty'of peace in 1763. One uniforní rule seems to have prevailed from their first settlement, as appears by their laws; that friendly Indians were protected in the possession of the lands " they occupied, and were'considered as owning them by a perpetual. right of' possession in the tribe or nation inhabiting them, as their common property, from generation to generation, not as the right of the individuals located on particular spots; -
 

 Subject to this right of possession, the ultimate fee was in . the crown and its grantees, which could be granted by the
 
 *746
 
 crown or colonial legislatures while the lands remained in possession of the Indians, though possession could not be taken without their consent. .
 

 . Individuals could not purchase Indian lands without permission or license from the-crown, colonial governors, or according to the rules prescribed by colonial laws; but such purchases were valid with such license, or in conformity with the local laws; and by this union of the perpetual right, of occupancy with the ultimate fee, which passed from the crown by the license, the title of the purchaser became complete.
 

 Indian possession or occupation was considered with reference to their habit's and modes of life ; their hunting grounds were' as much in their actual possession as the cleared fields' of the whites; and their rights to its exclusive enjoyment in their own way and for their own purposes were as much respected, until they abandoned them, made a cession to the government, or an authorized sale to individuals. - In either ca^é their right became extinct, the lands could be granted disincumbered of the right of occupancy, or enjoyed in full dominion by the purchasers from the Indians. Such was the tenure of Indian lands by the laws of Massachusetts (Indian Laws 9, 19, 15, 16, 17, 18, 19, 21) ; in Connecticut (40, 41,
 
 42);
 
 Rhode Island
 
 (52,
 
 55) ; New Hampshire (60) ; New York (62, 64, 71, 85, 102); New Jersey (133); Pennsylvania (138) ; Maryland (141, 143, 144, 145); Virginia (147, 148, 150, 153, 154); North Carolina(163, 4, 58); South Carolina (178, 179); Georgia(186 187); by congress, (Appendix 16); by their respective laws, and .the decisions of courts in their.construction. (See cases collected in 2 Johnson’s Dig. 15, tit. Indians; and Wharton’s Dig. tit. Land, &c. 488.) .Such, too, was the view taken by this court of Indian rights in the case of Johnson v. M’Intosh (8 Wheat. 571, 604); which has received universal assent.
 

 The merits of this case do not make it necessary to inquire whether the Indians within the United States had any other rights of soil-or jurisdiction ; it is enough to-consider it as a ■settled principle, that their right of occupancy is considered as sacred as the fee simple .of the whites. (5 Peters 48.) The principles which had been established in the colonies were adopted-by the king in the proclamation of October 1763, and applied to the provinces acquired by the treaty of peace and
 
 *747
 
 ihe crown lands in the royal provinces, now composing the United States, as the law which should govern the enjoyment and transmission of Indian and vacant lands. After providing for the government of the acquired provinces, (1 Laws U. S. - 443 — 444) it authorises the governors of Quebec, East and West Florida, to make grants of such lands as the king had power to dispose of, upon such terms as have been usual in other colonies, and such other conditions as .ihe crown might déem necessary and expedient, without any other .restriction. It also authorised warrants to be issued by the governors for military and naval services rendered in the then late war. It reserved to the Indians the possession of their lands and hunting grounds; and prohibited the granting any warrant of survey, or patent for any lands" west of the heads of the Atlantic waters, or which, not having been xeded or purchased by the crown, were reserved to the Indians; and prohibited all purchases from them without its. special license. The warrants issued pursuant to this proclamation for lands then within the Indian boundary, before the treaty of Fort Stanwick’s in 1768, have been held to pass the title to the lands surveyed on them, in opposition to a Pennsylvania patent afterwards issued. (Sims v. Irvine, 3 Dallas 427 — 456.) And all titles held under the charter or license of the crown to purchase from the Indians have been held good, and such power has never been
 
 denied;
 
 the right of the crown to grant being complete, this proclamation had the effect of a law in relation to such purchases; so '. it has been considered by this court. (8 Wheat. 595 — 604.), Settlements made by permission of the commanding officers of posts on lands not ceded by the Indians, have been held to give a pre-emption to lands in a proprietary government, and warrants and patents for such lands have been uniformly held good, when knowingly made by the proprietary or his officers as lands not purchased from the Indians. (See Wharton’s Dig. tit. Lands 488.) This proclamation also directed that purchases from Indians should be made at a public council or assembly, in .the presence of the governor or commander-in-chief of the colony, and be purchased for the king and in his name. (1 Laws 447.)
 

 The Indian deeds made at the treaty of Fort Stanwick’s were to the king in trust, for the grantees. '(Colony Titles 82 — 98.)
 

 
 *748
 
 Grants made by the Indians at public councils have since 'Tween made directly to t^e purchasers or to the/state in which •the land lies, in trust for them, or with directions to convey to them, of which there áre many instance? of large tracts so-sold and held, especially in New York. (Indian Treaties 13— 38.)
 

 It. was an universal rule that purchases made at Indian treaties,in the presence and with the approbation of the officer, under whose .direction they were held by the authority of the crown, gave a valid title to the lands ; it prevailed under the laws of the statés áfter the're volution, and yet continues in those where the right to the ultimate fee is owned by the states or their . grantees. It has been adopted by the United States, and purchases made at treaties held by their authority have been always held good by the ratification of the treaty, without any patent to the purchasers from the United States. This rule in the colonies was founded on'a settled rule of the law of1 England, that by his prerogative the king was the universal occupant of all vaca it land in his dominions, and had the right to grant it at his pleasure, or by his authorised’officers. (Hob. 322; Co. Litt. 1, 41, b ; 4 Bac. Abr., Prerog. 153 ; 7 Day’s Com. Dig. 76.)
 

 The authority of the proclamation is in the right of the king" to législate over a conquered'country, which, as lord Mansfield says, was never.denied in Westminster Hall, or questioned in parliament. If a king* comes to a'country by conquest, he may alter.its laws; but if he comes to it by title and descent, it must be with consent .of parliament. He is entrusted' with making the treaty of peace; he may yield up the conquest or retain it on what, terms he pleases. These powers no man ever disputed; neither has it hitherto been controverted that the king might change part orthe whole of the law or political form of government of a conquered dominion. He comes ire
 
 place of the king of Spain,
 
 the former sovereign. (Cowper 204, 213), in a case arising under .this proclamation.) The proclamation of October 1763, then, must be. taken to be the law of. the Floridas till their cession by Great Britain to Spain in 1783, superseding during that period the laws of»Spain which . had been before in force inthose provinces, so far as they were repugnant; and according to the established principles of the
 
 *749
 
 laws of nations, the laws of a conquered or ceded country remain in force till-altered by the new sovereign. The inhabitants thereof also retain all rights not taken from them by him in right of conquest, cession, or by new laws. It is clear then that the Indians of Florida had a right to the enjoyment of the lands and hunting grounds reserved and secured to them by this proclamation, and by such tenure and on such' conditions as to alienation as it prescribed, or ■ such as1 the king might afterwards direct or authorise. The Indians had also -a right to the. full enjoyment of„such rights of property as the king might choose to impart to them' by any regulation, by treaty or promise made to them by his authority.
 

 By. the treaty of Mobile in 1765 the boundary of the lands or hunting grounds reserved and claimed by the Chickasaw and Choctaw Indians was settled, a cession was made to the king, reservihg to themselves, full right and property in all the . lands northward of such boundary. (Record 309.)
 

 The treaty of Pensacola in the same year- established the boundary with the upper and lower Creeks, who made a cession of lands, which they granted and confirmed to the king, (Record 310, 3Í1) and a-similar treaty was made with the Creeks at Plcolata, in east Florida, in the same' year. (Record 312.)
 

 By thus holding treaties with thése Indians, • accepting of cessions from them with reservations, and establishing boundaries with'them, the king waived all rights accruing by conquest or cession, and thus most solemnly acknowledged that the Indians had rights of property which they could cede or reserve, and that the boundaries of his territorial and proprietary rights should be such, and such only as were stipulated by these treaties.
 

 This brings into practical operation another principle qf law settled and declared in the case of Cámpbell v. Hall, that the proclamation of 1763, which was the law of the provinces cejled by the treaty of 1763, was binding on the king himself, and that a right or exemption once granted by one proclamation could nqt be annulled by a subsequent. (Cowp. 213.) It cannot be necessary to inquire whether rights secured by a treaty approved by the king are less than sacred under his voluntary proclamation.
 

 
 *750
 
 By the treaty of Augusta in 1773, a-cession wa3 made to the king of certain lands for á specified consideration, which was to be paid to persons'to .whom the Cherokees and Creeks were indebted, and tó defray the expenses of the treaty. This : cession was made under an asserted claim of a right of pro■perty by the Creeks to the ceded lands, and a boundary was established between their remaining lands and those of the king in Georgia. (Record 313 — 317.) By a subsequent treaty at Augusta in 17,83, and at Shoulderbone in 1786, the obligation of the Indians to pay their debts is mutually recognized. (Record 3-17.) By the treaty of Fort Schuyler in 1788, the obligation of the Indians to make compensation for injuries committed by them, is also admitted, as is also the case in treaties with the United States. (1- Laws 371, 407, 409, 410.) It may then be .considered as a.principle estab-. lished by the king that the Indians were competent judges of the consideration on which they granted their lands; that they might be granted for the payment of debts, and that this principle has been fully-recognized by the United States. It can hardly be contended that while- such cessions by the .Creeks were valid in Georgia on one side of a then imaginary line, they would be void on the other side in Florida, as to lands held under, the same law and by the same tenure. Whether the grants were made to the king directly, and the debts or injuries which formed their consideration be paid by him to the persons to wlipm they were due, or compensation made through him, or directly to the parties by a grant to. them, must be a matter purely in' the discretion of the king, or the officer whom he had authorised to accept or -confirm the cessions by his license. Such were the relations between the India’ns and Great Britain as established by the proclamation of 1763,.and confirmed by subsequent treaties between then, from 1765 to 1779, (Record 186, 188) during the period of her dominion over the Floridas. This liberality and kindness to them, with respect for their rights of property in their lands or hunting grounds, would seem to have arisen more from a sense of justice than motives of mere policy, when we consider the position of Great Britain between the treaty of 1763 and the commencement of, the revolution. The undisputed sovereign of the whole territory from-the Gulf of Mexico to that
 
 *751
 
 of St Lawrence, she had little to fear from the rival or hostile policy of Spain,. the only neighbour to her colonies, and who had been humbled during the preceding war, and weakened to such a degree that she was no longer formidable in Louisiana. It was far different with Spain. , On taking possession, of the Floridas, after the independence of the United States had been established,' with such a formidable, and rival, if not hostile neighbour along the whole line of a narrow and weak province, the friendship of the Indians was a most important consideration. It would have been lost, by adqpting towards, them a less liberal, just, or kind policy than had been pursued by Great Britain, or acting according to the laws of the Indies in force in Mexico and Peril. It was soon found necessary not only to respect their rights, as they had been enjoyed for twenty years before, but to place them on the permanent foundation of treaties and direct guarantees by the king. The most solemn assurances of both were given. (Record 232.)
 

 A treaty was accordingly held in Pensacola in 1784 with the Tallapoosas or Seminoles/ the object of which was declared to be to make the subjects of the king enjoy the fruits of .peace, by which the Indians acknowledge themselves his subjects, promising to obey the laws in those points which were compatible . with their character ■ and circumstances, conforming themselves to the usages and municipal customs which are established (Record 320), observing their contracts with the . traders in good faith (Record 323), and promising, to observe “ those orders exacted by reason; equity and justice, the principal basis of this congress.”. By the thirteenth article, the' officers of the crown promised in the royal name, the security and guarantee of the lands which the Indians hold, according to the right of property with which' they possessed them, on the sole condition that they are comprehended within the limits of the king as the sovereign. (Record 324, 404, 405, 364.)
 

 In 1793 another treaty was held at the Walnut Hills with the same Indians (among others); it' was declared to be a treaty of friendship and warranty between them and the king, who was declared their immediate protector and mediator between them and the American states, in order to regulate their boundaries with them, and preserve the Indians in the possession of. their lands. They were referred to the governor of West Florida, “ as
 
 *752
 
 representing the king in it-,” by the fifth article, with a stipulation in the. fifteenth, that the points negotiated would be determined on by the commissaries of the king, with the.approbation of the governor of that province, with the same force as if expressed in the treaty. By the nineteenth article, the Spanish and Indian nations approved and.ratified all which was contained it, and mutually promised and swore a mutual guarantee, • the Indians declaring themselves under the protection of the king, he assuring them of his protection in all cases.where they wanted it. (Record 240 — 245.) This treaty also ratified all former treaties made from 1784. (Record 241.) They were also approved by the king (Record 117, 118), and thereafter considered by the highest officers of the government in Florida, Louisiana and Cuba, as solemn guarantees to the Indians' of all the rights they held .under Great Britain. (Record 139, 140, 168, 174, 181 — 189, 228, 220, 232 — 247, 257, 258, 295, 570, 583.) This right was occupancy and perpetual'possession, either by cultivation, or as hunting grounds, which was held sacred by the crown, the colonies, the states and the United States; while the .unauthorized settlement of the whites, on royal or proprietary lands, gave them not even the right of pre-emption, unless by special laws, or custom and usage, sanctioned by proprietary officers. (See ’ Wharton’s Dig. ut supra.)
 

 But Spain did not consider the' Indian right to be that of mere occupancy and perpetual possession, but a right of. property in the lands they held under the guarantee of treaties, which were so highly respected, that in the establishment of a military post by a royal order, the site thereof was either purchased from the Indians or occupied with their permission, as that of St Mark’s. The evidence
 
 of
 
 governor.Folch, given in 1827, on the nature of the Indian title, is very strong and full (Record 231 — 235), and the high respect paid to it by all the local authorities so late-as 1816, is strikingly illustrated in a report of the surveyor-general of West Florida, It seems that in that year an application was inade for permission to buy lands on the other side of the Bay of Pensacola, to which the reply of the governor and sub-intendant was, if the lands are situated on the side from Yellow Water hitherward, “ I ani persuaded they belong - to the Indians,
 
 even our omi careening
 
 
 *753
 

 ground which is in front of this town”
 
 (Record 172): which, .according to another report from the surveyor-general, belonged byt the treaties with England, to the Indians (Record 175); and who refers to the limited space of province left to the government, and the necessity of- recurring to negotiations with the Indians to obtain some of the lands; which are the best in the vicinity of Pensacola. (Record 176.)
 

 When their right is thus regarded as to their lands in the immediate vicinity of the seat of • government of the province at so late a period, jt cannot be doubted, that it was considered by the officers tíf the king as at least equally valid in a far distant part, remote from any habitation of the-whites, save those connected with the house óf Panton or Forbes. Although it may be conceded as a principle of national law, that when Spain topic possession of these provinces, the king could establish whatever form of government- or system of laws he pleased ; consider by the law of power, though not of right, the Indians as his subjects or as mere savages, with whom there should be no relations but those of peace and trade, and who held no rights otherwise'than at the pleasure of the go-vémment, or according to the laws in force in other provinces; yet, it was' his orders to his officers to continue and confirm those relations which had previously existed, to consider, treat and protect the Indians as his subjects, and to give them, new and most solemn pledges of his protection in all their rights, as individuals; and as nations or tribes, competent parties to treaties of mutual guarantee, for. his, as well-as their protection in those provinces, which had not before b.een done in any of his dominions.
 

 This was not done for slight reasons, but for such as would seem in the opinion of all the great officers of the provinces to have led to these treaties, and strong stipulations, as indispensable to secure their possession.. But their obligation on the king did not depend on the motives which led. to their adoption; they bound his faith, and when’approved by him became the law of the provinces, by the authority of royal orders, which were supreme, and bound both king and Indians as contracting parties, in this respect as nations on a footing of equality of right and power. The consequence was, that when once received into his protection as individuals, they
 
 *754
 
 became entitled by the law of nations and of. the provinces, on the same footing as the other inhabitants thereof,.to the benefits of the law and government, which, in every dominion, equally affect and protect all persons and all property within its-limits, as the rule of decision, for all questions which arise there, (Cowper 208) as in this ease it must be as to thé right of property in the Indians., The situation of the Florida Indians was well known to the United States, as. is most clearly indicated in the fifth article of the treaty with Spain. in 1795 r “ so that Spain will hot
 
 suffer her Indians'to
 
 attack the. citizens, of the United States,
 
 nor the Indians inhabiting their-territory.”
 
 As thus considered by the United States and Spain, they were called
 
 i(her Indians,”
 
 while those in.the United States-were considered ás the mere inhabitants'of their territory, as the practical result of the respective treaties which were recognized as subsisting ones between the then contracting parties and the.Indians; of the stipulations of which-and their effect,' the United States could not have been otherwise than well informed at that time, as to the right.of property in Indian lands in the Floridas. When they acquired these provinces by the treaty of cession, it was not stipulated that any treaty , with the Indians should be annulled, or its obligation be held less sacred than it was under Spain ; nor is there the least reference to any intended change in the relations of the Indians towards the United States. They came in the place of the former sovereign by compact, on stipulated terms, which bound them to respect all the existing fights of the inhabitants, of . whatever description, whom the king had recognized as being under his protection. They could assume (no right of conquest' which may at any time have been vested in Great Britain or Spain, for they had been solemnly, renounced, and new relations established between them ,.by solemn treaties; nor did they take possession on any such assumption of right; on the contrary, it,was done under the guarantee of congress to the .inhabitants, without distinction, of their rights of property, and with the continued assurance óf-protection. They might, as the new sovereign, adopt any system of government or laws for the territory consistent with the treaty and the constitution ; but'instead of doing 'so,- all former laws and
 
 municipal regulations
 
 which were in existence at the cession, were con
 
 *755
 
 tinued in force. It was not necessary for the United States, in the treaty of cession, to enter into any new stipulation to protect and maintain the Indians as inhabitants of Florida, in the free enjoyment of their property, or as nations, contracting parties to the treaties of Pensacola and Walnut Hills with Spaiu.in 1784 and 17.93; for by the sixth article of the Louisiana treaty between France and the United States, they had promised “ to execute such articles and treaties as may have been agreed on betXveen Spain and the nations or tribes of Indians, until by mutual consent, other suitable articles shall have been agreed uppu.” (1 Laws .137.) These were the treaties which guaraiytied.to the Seminole Indians their lands according, to the ri^ht of proper^ with which they possessed them, and which were adopted by the United States,-who thus became the protectors of all. the rights they had previously enjoyed, or could of right enjoy under Great Britain or Spain, as individuals or nations, by any treaty to jvhich the United States thus became parties in 1S03.
 

 When they acquired and took possession of the Floridas,. these treaties remained in force over all the ceded territory by the orders of the king, as the law which regulated the relations between him and all the. Indians, who were parties to them, and were binding on the United States, by the obligation they had assumed by the Louisiana treaty, as a supreme law of the land which was inviolable by the power of congress. They were also binding as the fundamental law of Indian rights, acknowledged by royal orders and municipal regulations of the province, as the laws and ordinances of Spain in the ceded provinces, which were declared to continue in force by the proclamation of the governor in taking' possession of the provinces, and by the acts of congress, which assured all the inhabitants of protection in their property. It would be an unwarranted construction of these treaties, laws, ordinances and municipal regulations, were we to decide that the Indians were not to be maintained in-the enjoyment of all the rights which they could have enjoyed under eitliér, had the provinces remained under the dominion of Spain. It would be rather a perversion of their spirit, meaning and terms, contrary to the injunction of the law under which we act, which makes the stipulations of any treaty, the laws and ordinances of Spain.
 
 *756
 
 .and these acts of-congress, so far as either fipply to this case,the standard rules for our decision.
 

 On these considerations, we are clearly of opinión that the Indians who claimed the lands in question had, under the government of Great Britain and Spain, a right' of property in them which could not be impaired without a violation of the laws of both, and the sanctity of repeated treaties; that these rights continued till the time of the cession, are guarantied by the treaty and acts of. congress in relation to the.floridas, in perfect conformity with its stipulations and faith, unless the Indians had previously made a binding transfer to the parties under whom the petitioner claims them.
 

 The remaining question is, whether he has become invested with the right of the Indians, either in virtue of their deeds, or by the grant of the lawful authorities of the king, pursuant to the laws, usages and customs of- the Spanish government of the province. The proclamation of 1763 was .undoubtedly the law of the province till 1783 ; it gave direct authority to the governors of Florida to grant crown lands subject only to such conditions and restrictions as they or the king might prescribe. These lands were of two descriptions: such as had been ceded to the king by" the Indians, in which he had full property and dominion, and passed, in full property to the grantee; and those reserved and secured tp the Indians, in which their right was perpetual possession,_ and his the ultimate reversion in fee, which passed by the grant subject to the possessory right. The proclamation also authorized the union of these rights by a purchase -from the Indian's,- and taking -possession with the leave and license of the crown in favour of an individual, or by the governor at an Indian council, for and in the.name. of the king. This proclamation was also the law of all the North American colonies in relation to crown lands. The grants of the governors were universallyconsidered as made by the king through his authorized representatives, and when his authority to grant thbse lands of .the crown,-the right-to which was perfect by the union of the rights of possession with the reversion, it is scarcely possible that their authority would be more limited as to those in which t-he king^bad only a-uemote ultimate fee. ■_ Ás a rnatt.er of policy, it was for the benefit of the king and colony to substitute the' possession, settlement and culti
 
 *757
 
 vation of,the whites for the mere occupancy of,the Indians in the pursuit"of game; and it cannot be imagined, without clear proof, that the autograph'of the king, or his order in-council, should be indispensable-for. a license or permission to purchase, when a patent was valid without either. Thejeis.no evidence in the record or in the history of the colonies that such a distinction existed in law or usage, but is in direct -collision with all the colonial laws relating to purchases from the Indians, as well'as the course pursued at treaties,, when deeds were made to purchasers wit.li the consent' of the governor, or to the king, state, or United States, for their use, or in trust to convey to them. There is no evidence or reason to induce the belief tha Spain acted in any other manner in the confirmation of India, deeds; the usage of her local governors and commandants < posts jn such confirmation, is in precise conformity to that oi the other colonial officers under Great Britain, and was also in -conformity to.the existing laws of Spain. (Record 329.) From the confirmation of the Houma grant in 1777 by the governor-general of Louisiana to that of the captain-general' of Cuba of this, in 1811, during forty years, no instance appears of a direct confirmation by the king, or. of his ever having , required any other act than the approbation of the local governor to give perfect validity to the purchase."
 

 - Independently of these considerations ‘there is another, founded on the treaty at the Walnut Hills, with the Creek and Tallapoosa Indians, held by the then governor of West Florida, under the authority of the governor-general of Louisiana. ■ Tlie governor of that province, is in the fifth article declared to be
 
 “
 
 as representing the king in it.” ■ Such a stipulationin a.treafy óf friendship and warranty would, bind the king in good faith not to disavow his acts declared to be done, in the royal name and authority. It would be an imputation on his faith to his acknowledged subjects, plighted by repeated- guarantees, to suppose that. he. intended by the treaty of'cession to exclude from confirmation, those lands which his white subjects had purchased from the Indians under the sanction of treaties, with the approbation and formal confirmation of his highest officers ; and to confirm only those grants of the royal domain, which had been made at the mere will of his governors, for such consideration only as they might prescribe.. If there could be any
 
 *758
 
 . foundation for such an imputation in any case, the history, t'érm.s and consideration for the present grants would at once repel it; and when we, consider, that the United Statés accepted of the cession with a knowledge that they had been made, as well as- the circumstances, under which they were made, connected with the quantity of land embraced within them, without excepting them from confirmation, we can have little doubt that it was the meaning and- intention of both contract-, ing parties to the treaty, to place them on the same footing as the grahts of lands belonging to the royal domain.
 

 There, is nothing in the treaty which authorizes a distinction between such grants, .which operate by their own force as a transfer of the full property in royal lands, held by the crown under cessions from the Indians; or deeds of confirmation, which give validity to grants conveying the Indian right, in . confirming the transfer by the license of the king in the person of his representative.
 

 The governor was equally the lawful authority of the king for the one purpose as the otherthough he had, by his royal order, transferred the power to grant royal lands, from the governor to tiie attendant; he' had not affected the authority of the former, to confirm grants made by the Indians in such form as to validate the title conveyed. Whether this act of the governor operated by way of confirmation or grant is immaterial;, it gave such effect to the purchase, that the lands became the property of the purchaser, so that they could not revert to the crown by the .abandonment of the Indians,-or any judicial process known to the'law of England or Spain, which in substance and effect were the same. When we look, too, to the very remote contingent interest which the king could have to .these lands, consistently with his guarantee to the Indians, there can be no reason perceived why deeds or grants, operating to confirm in full property to the purchasers from the Indians, lands thus guarantied to them, should not be held in a court of equity as valid as original grants of the royal domain.
 

 The Indian right to the lands as. property, was not merely of possession, that of alienation was concomitant; both were equally secured, protected, and guarantied by Great Britain and Spain, subject only to ratification and confirmation by the •license, charter, or deed from the governor representing the
 
 *759
 
 king. .Such purchases enabled the Indians to pay their debts, compensate for.theirde'predations on the.traders resident among them, to provide for their wants; while they were available to the purchasers as payifient of the considerations which at their expense had been' received by the Indians. It would have been a violation of the faith-of the government to both, to encourage traders to settled n the province, to put themselves and property, in the power of the Indians,-to .suffer the latter to contract debts, and when willing to pay them by the only means in their power, a cession of their lands, withhold an assent to the purchase, which by their laws or municipal regulations was necessary to vest a title. Such a course was never adopted by Great Britain in any of her colonies, nor by Spain in Louisiana or Florida: of this fact there is abundánt proof in the record,-by public documents, and the testimony of the' highest officers of the local government, the laws, usages and customs of which were well known to the United States before the treaty. The report of the commissioners on Opelousas claims was submitted to the secretary of the treasury in 1815; acted on and approved by congress in 1816; in which report the commissioners state
 
 u
 
 that the right of the Indians to, sell their land, was always recognised by the Spanish government. (Record 328.) The laws made it necessary when the Indians sold their lands to have the deeds presented to the governor for confirmation, (Record 329.) The sales by the Indians transferred the kind of right which they possessed; the ratification of the sale by the- governor must be regarded as a relinquishment of the title of the crown to the' purchaser (Record 333), and no instance is known where permission to sell has been. “ refused (Record 330), or- .the rejection of an Indian sale” (Record 336).
 

 . In the present case the Indian sale has been c.onfirmed'wilh more than usual solemnity and publicity ; it has been done at .a public council and convention of the Indians conformably to -treaties, to which the king was a party, and which the United States adopted, and the grant was known to both parties' to the treaty of cession. The' United States were not deceived. by the purchase, which they knew was subject to the, claim of the petitioner, or those from whom he purchased, and made no stipulation which should put it to a severer test than
 
 *760
 
 any
 
 other;
 
 and it was made to a house which, in considera- ' tion of its great and continued services io the king and hie predecessor, had deservedly given them high claims as well on his justice as his faith.- But if there could be-a doubt that the evidence in the record did not establish the fact of a royal license or assent to this purchase as a matter of specific and judicial belief, it would be presumed as a matter of law arising from the facts and' circumstances of the case, which are admitted or unquestioned.
 

 As heretofore decided by this court, the law presumes the existence in the provinces of . an officer authorized to make valid grants (6 Peters 728 ; 8 Peters 459); a fortiori, to give license to purchase and to confirm; and the treaty designates the governor of West Florida as the proper officer to make grants of Indian lands by confirmation as plainly as it does the governor of East Florida to make original grants (8 Peters 452), or the intendant of West Florida to grant royal lands. A direct grant from the crown of lands in a royal haven may be presumed on an uninterrupted possession of sixty years (2 Anst. 614; 1 Dow. Par. Ca. 322, 323); or a prescriptive possession of crown lands for forty years (3 Dow. Par. Ca. 112). . An encroachment-on a royal forest by a continued possession of twenty years wilj be presumed to have been by the license of the crown or bya grant., if no act of parliament prohibits it. (11 East 57, 284, 488, 495.) On the same principle, after a long possession of Indian lands the law would presume that i't was founded on an Indian deed duly confirmed, or any title consistent with the facts and circumstances in evidence. (1 Paine 469, 470.) Any thing which would make the ancient appropriation good .(Cowper 110), if it cotild have had a lawful foundation, for whatever may commence by grant is good by prescription. ■ (1 Roll. Ab. 512; 4 Mod. 55 ; 1 Saund. 345.) The length of time which brings a given case within the legal presumption of a grant, charter, or license, to validate a tight long enjoyed, is not definite, depending on its peculiar circumstances ; in this case we think it might be presumed in less time than when the party rested his claim oh prescriptive possession alone. There is every evidence, short of the sign manual or order of the king, approving and confirming this grant, and if that were wanting to secure
 
 *761
 
 a light of property to lands which have been held as these have been, the law would presume that it once existed, but was lost in the lapse of time and change of governments. The more especially as by the laws of Spain prescription for the périod of ten years has the' same effect as twenty by the principles of the common law.
 

 For these reasons we think the title of the petitioner is valid by all the rules prescribed by the acts of congress, which give us jurisdiction of the case.
 

 This cause came on to be heard on the transcript of the record from the superior court for thé middle district of Florida,
 

 ' and was argued by counsel: on full consideration whereof, this court is unanimously of opinion, that the title óf thé 'petitioner to so much of the lands in controversy as is embraced within the lines and boundaries of the- tract, granted by the deeds, grants and acts of confirmation to Panton, Leslie- & Co. in Í804 and 1806; also to the .island in the river Appalr-chicola, ceded, granted and confirmed to John Forbes in' 1811; also to .the lands and islands at and west of the mouth of said river, which were ceded, granted and confirmed to John Forbes & Co. in 1811, is valid by the law of nations; the treaty between the-United States and Spain', by which the territory of the Floridas was ceded to the former; the laws and ordinances of Spain, under whose government' the' title originated ; the ■proceedings under said treaty, and the acts of congress relating thereto: and do finally order, decree, determine and adjudge accordingly. And this court doth in. like manner order, adjudge, determine and decree, that the title of the petitioner to so much, of the tract of land which lies east of the "first mentioned tract, between the rivers Wakulla and St ' Mark’s, which was conveyed to John Forbes & Co. in 1811, as shall not be'included in the exception hereinafter made, is valid by the laws, treaty, and .proceedings as aforesaid; with the exception of so much of the last mentioned tract as includes the fortress of St Marks and the territory directly and imme-. diately adjacent and appurtenant thereto, which are hereby - reserved for the use of the United States. And it is further-ordered and decreed, that the territory thus described shall be
 
 *762
 
 that which was ceded by.the Indian proprietors to the crown of Spain for the ,purpose of erecting the said fort, provided the boundaries of the said cession can be ascertained: If the . boundaries of the said cession camiot how be ¿scertained, then the adjacent lands which were considered arid held by the Spanish 'government or the commandant of the post as annexed to the fortress, for military purposes, shall be still considered as annexed to it, and reserved with it for the use of the United States. If.no evidence can now be obtainedjto designate the extent of the adjacent lands,, which were considered as annexed to St Mark’s as aforesaid,, .then so much land shall be corripre-hended in this exception as, according to the military usage, was generally attached to forts in Florida or the adjacent colonies. If no' such military usage can be proved, then it is ordered and decreed that a line'shall be extended from the point of junction between the rivers St Mark’s and Wakulla to the middle of the river St Mark’s, below the junction, thence extending up the middle óNeach river three miles in a direct line, without computing the courses thereof; and that the territory, comprehended'within á direct line, to be run so as to connéct the points of termination on each river, at'the end of the said three, miles up each river, and the two lines to.be run as aforesaid, shall be, and the same is hereby declared to be,the territory reserved as adjacent and appurtenant to the fortress of St Mark’s, and. as such reserved for the use of the United States. To which the claim of the petitioner is
 
 rejected; and
 
 as to which this court decree that the same is a part of the public lands of the United States.
 

 The decree of the court below is, therefore, reverged and annulled in all matters and things therein contained, with the exception aforesaid; and this court, proceeding to render such decree as the said court ought to have rendered, do order, adjudge and decree, that the claim of the petitioner is valid and ought to be confirmed, and is and .remains confirmed by the treaty, laws and proceedings aforesaid, to all the lands embraced therein, except such part as is herein above excepted. And this court does further ordet, adjudge and decree, that the clerk of this court certify the sarifo to the surveyor-general of Florida, pursuant1 to layi, with directions to survey arid lay off the lands described in the petitiqri of the claimant, according
 
 *763
 
 to the lines, boundaries and description thereof in the. several deeds of cession, grant and confirmation by the- Indians or governor of West Florida filed as exhibits in thü causé, or referred to in the record thereof, excepting nevertheless such part of the tract granted in 1811, lying east of the tract granted in 1804 and 1806 as is hereby declared to be the territory of the United States, pursuant to the exception herein before men* tioned, and to make return thereof according to law as to all the lands comprehended in the three first herein mentioned tracts. And as to the tract last herein mentioned, to survey and in like manner to lay off the same, so soon as the extent of the land herein excepted and reserved for the use of the United States shall be ascertained in the manner herein before directed.
 

 And this court doth further order, adjudge and direct, that the extent and boundaries of the land thus excepted and reserved shall be ascertained and. determined by the superior court of the middle district of .Florida in such manner and by such process as is prescribed by the acts of congress .relating to the claims of lands in Florida, and to render thereupon such judgment.or decree, as to law shall appertain.