DETERMINED IN

# THE SUPREME COURT

OF THE

## TERRITORY OF NEW MEXICO.

### JANUARY TERM, 1854.

---

### JAMES N. WARD v. JAMES M. BROADWELL.

CONQUEROR MAY PRESCRIBE LAWS FOR CONQUERED TERRITORY.—By virtue of the rights of war, a conquering nation has power, without any formal act of legislation, to change the laws of conquered territory, and to prescribe new ones for its government while in the possession of the conqueror.

VALIDITY OF "KEARNY CODE" AND ACTS OF 1847.—The system of laws known as the "Kearny code," and the acts of the general assembly of New Mexico of the December session, 1847, were valid, except so far as they attempted to confer political rights upon the inhabitants, under the constitution of the United States, the same having been established by competent authority by virtue of the rights of war.

LAWS NOT ABROGATED BY TREATY OF PEACE.—The provisional government established in this territory by military authority was not abrogated by the treaty of Guadalupe Hidalgo, but remained in operation as a government *de facto* until the territorial government was established, and its laws continued in force until superseded by the laws of the new government.

REPLEVIN ACT OF 1847, VALIDITY OF.—The replevin act of 1847 was enacted by competent authority, and is now a valid law, having remained in force until July 14, 1851, when it was continued by the territorial legislature.

NONSUIT NOT SUBJECT OF ERROR, WHEN.—A voluntary nonsuit can not be made the subject of error.

JUDGMENT FOR DEFENDANT IN REPLEVIN IS FINAL, WHEN.—A judgment for the defendant in replevin, giving him the value of the property and double damages and costs, after reciting a submission to a jury "whereupon the said plaintiff fails to prosecute his said suit further, and there-

upon the jury is discharged," etc., is a final judgment, and not a nonsuit, and is the subject of error.

NONSUIT NOT VOLUNTARY, WHEN.—Where a plaintiff is compelled to abandon his case by an adverse decision upon a vital point therein, to which he excepts, it can not, it seems, be deemed a voluntary nonsuit precluding an appeal.

PARTY ON RECORD NOT COMPETENT WITNESS.—A party on the record, though divested of all interest, is not a competent witness.

PARTY ON RECORD, WHO NOT DEEMED TO BE.—Where the question as to whether one is a party to the record or not depends upon a future event, he should not be deemed so to be until the future event happens. Hence, one who has signed a replevin bond as agent for the plaintiff, and may become liable to a judgment against him, should not be deemed a party to the record until that event occurs.

PROOF OF INTEREST OF WITNESS, HOW MADE.—A witness' interest may be shown by his examination on his *voir dire*, or by evidence *aliunde*, but the objecting party must elect between these methods, and can not resort to both.

PARTY SIGNING REPLEVIN BOND AS AGENT NOT COMPETENT.—One signing a replevin bond as the plaintiff's agent, is disqualified by his interest from being a witness for the plaintiff, though he denies that he is interested.

DISCRETION REVIEWABLE, WHEN.—The discretion of a court must be exercised in conformity with law and with the usages of courts, and if not so exercised, is reviewable in a superior court.

SUBSTITUTING NEW PARTY ON REPLEVIN BOND.—The refusal of the court to permit the plaintiff, in a replevin suit, to release one signing as his agent on the replevin bond, for the purpose of making him a witness by substituting another person on the bond in his stead, is error. *Contra*, Deavenport, C. J., dissenting.

ERROR from Santa Fe county. The case is fully stated in the opinion of Watts, J.

*Quin and Smith*, for the appellant.

*R. H. Tompkins*, for the appellee.

By Court, WATTS, J.:

This was an action of replevin brought by James N. Ward against James M. Broadwell, for one buggy and one set of harness for two horses. The suit was instituted on the twentieth day of June, 1853. The replevin act under which this suit was brought was passed by the general assembly of the territory of New Mexico, at its December session, 1847. The treaty of Guadalupe Hidalgo was made on the second day of February, 1848. The question which

first suggests itself to the consideration of the court is this: Was the replevin act under which this suit was brought passed by that general assembly after the treaty of peace and before the passage by congress of the organic law, under which a territorial government was organized here, a valid or void act?

If the law emanated from a body having no legislative power or legal existence, it is void, and no rights can be asserted under it. The first legislative assembly of the Territory of New Mexico convened under the organic law of the ninth of September, 1850. On the fourteenth day of July, 1851, it passed an act, the first section of which reads as follows: "That all laws that have previously been of force in this territory that are not repugnant to or inconsistent with the Constitution of the United States, the organic law of this territory, or any act passed at the present session of the legislative assembly, shall be and continue in force, excepting in Kearny's code, the law concerning registers of land:" See Laws of the Territory, sec. 1, p. 176. If the replevin act ever was in force, that act continued it in existence.

The capacity, then, of the general assembly of New Mexico to enact at its December session, 1847, a valid law, is now the point for consideration. On the thirteenth of May, 1846, congress acknowledged the existence of a state of war between the United States and the republic of Mexico, and provided for its prosecution. In the prosecution of that war General Kearny marched with forces of the United States against the department of New Mexico, and took possession of it. General Kearny, on the twenty-second day of August, 1846, issues to the people of said department a proclamation, in which he says: "As by the act of the republic of Mexico, a state of war exists between that government and the United States; and as the undersigned, at the head of his troops, on the eighteenth instant, took possession of Santa Fe, the capital of the department of New Mexico, he now announces his intention to hold the department, with its original boundaries (on both sides of the Del Norte), as a part of the United States

and under the name of the territory of New Mexico." On the twenty-second day of September; 1846, General Kearny enacted an organic law for the government of the territory, and a system of laws for the administration of public justice, and the protection of life, liberty, and property of the people of New Mexico, known generally as the Kearny code. A copy of these laws, and a list of the appointments to civil offices in the territory, was inclosed to the adjutant-general on the twenty-second of September, 1846, and were received at the war department on the twenty-third of November, 1846. Thus the supreme authority and sovereignty of the republic of Mexico ceased to exist in New Mexico, and its assumption and exercise upon the part of the United States as the conqueror of this territory began.

Under what authority did this state of things take place, and what binding effect has the system of government thus instituted? This was a conquered territory, and in the case of the *Canal Appraisers* v. *The People,* 17 Wend. 584, it was decided that there is no doubt of the power of the sovereign to change the laws of a conquered or ceded territory by a mere declaration of his will, without any formal act of legislation, unless restrained by the capitulation or treaty of cession.

No formal act of legislation is necessary to change the law; the mere will of the conqueror is sufficient: 1 Kent, 178, note *a.* This principle of law that a conqueror has the right to enact laws for the government of his conquest, while in his possession, is illustrated and explained with reference to New Mexico in the message of the president of July 24, 1848, Ex. Doc. No. 70, as follows: "In my message of December 22, 1846, in answer to a resolution of the house of representatives calling for information in 'relation to the establishment or organization of civil government in any portion of the territory of Mexico which has or might be taken possession of by the army or navy of the United States,' I communicated the orders which had been given to the officers of our army and navy, and stated the general authority upon which temporary military governments had been established over the conquered portions of Mexico,

then in our military occupation. The temporary govern-
ments authorized were instituted by virtue of the rights of war.
The power to declare war against a foreign country, and
to prosecute it according to the laws of war, as sanctioned
by civilized nations, it will not be questioned, exists under
our constitution. When congress has declared that war
exists with a foreign nation, the laws of war apply to our
situation, and it becomes the duty of the president, as the
constitutional commander-in-chief of the army and navy of
the United States, to prosecute it. In prosecuting a foreign
war thus duly declared by congress, we have the right, 'by
conquest and military occupation,' to acquire possession of
the territories of the enemy, and during the war to exercise
the fullest rights of sovereignty over it. The sovereignty of
the enemy in such cases is suspended, and his laws can no
longer be rightfully enforced over the conquered territory,
or be obligatory upon the inhabitants who remain and sub-
mit to the conqueror. By the surrender the inhabitants
pass under a temporary allegiance to the conqueror, and are
bound by such laws, and such only, as he may choose to
recognize and impose. From the nature of the case no
other could be obligatory upon them, for when there is no
protection, or allegiance, or sovereignty, there can be no
claim of obedience. These are well-established principles
of the laws of war as recognized and practiced by civilized
nations, and they have been sanctioned by the highest
tribunals of our country. The orders and instructions
issued to the officers of the army and navy applicable to
such portions of the Mexican territory as had been, or
might be, conquered by our arms, were in strict conformity
to these principles. They were, indeed, in amelioration of
the rigors of war upon which we might have insisted. They
substituted for the harshness of military rule something of
the mildness of civil government, and were not only the
exercise of no excess of power, but were a relaxation in
favor of the peaceful inhabitants of the conquered territory
who had submitted to our authority, and were alike politic
and humane."

The president further says that New Mexico and Upper

California were among the territories conquered and occupied by our forces, and such temporary governments were established over them. "They were established by the officers of our army and navy in command, in pursuance of the orders and instructions accompanying my message to the house of representatives, December 22, 1846. In their form and detail, as first established, they exceeded in some respects, as was stated in that message, the authority that had been given, and instructions for the correction of the error were issued in dispatches from the war and navy departments of the eleventh of January, 1847, copies of which are herewith transmitted."

It is now necessary to direct our attention to the dispatches from the war and navy departments of the eleventh of January, 1847, in order to ascertain in what respect the government of New Mexico, as established by General Kearny, exceeded the authority given, and what "error" said dispatches were intended to "correct." W. L. Marcy, secretary of war, in his dispatch, says: "It is proper to remark that the provisions of the laws which have been established for the government of the territory of New Mexico go, in some few respects, beyond the line designated by the president, and propose to confer upon the people of that territory political rights under the constitution of the United States. Such rights can only be acquired by the action of congress. So far as the code of laws established in New Mexico by your authority attempts to confer such rights, it is not approved by the president, and he directs me to instruct you not to carry such points into effect." The term political rights, in its most extended signification, is " the power to participate, directly or indirectly, in the establishment or management of government?" See Bouv. Law Dict., vol. 2, tit. Rights, p. 475. But the secretary of war does not use the term in that sense, but he qualifies its signification by saying, " political rights under the constitution of the United States."

It is now necessary to examine the laws which have been established for the government of New Mexico, for the purpose of seeing what "political rights, under the constitu-

tion of the United States," had been conferred on the people of New Meixco. All the laws thus enacted will be found in the Kearny code, and section 8, of article 3 of the organic law of New Mexico, established by General Kearny September 22, 1846, as follows: "All free male citizens of the territory of New Mexico who then are, and for three months next preceding the election shall have been, residents of the county or district in which they shall offer to vote, shall be entitled to vote for a delegate to the congress of the United States and for members of the general assembly, and for all other officers elected by the people" (section 9). "The first election for a delegate to the congress of the United States and for members of the general assemby shall be on the first Monday in August, A. D. 1847, and the governor, by proclamation, shall designate as many places in each county as may be necessary for the public convenience, at which the electors shall vote.' The tenth section provides that the general assembly shall convene at Santa Fe on the first Monday in December, A. D. 1847, and on the first Monday every two years thereafter, until otherwise provided by law, etc.

If there are any other laws which were then in existence, to which the secretary of war alluded, which conferred upon the people of this territory "political rights under the constitution of the United States," they have escaped our attention. If we be right in this, the secretary alluded to the authority given to elect a delegate to congress as the only excess of authority conferred by these laws " beyond the line designated by the president."

This point is presented more in detail in instructions prepared under the direction of the president by the secretary of the navy in his dispatch to Commodore Stockton, dated January 11, 1847. The secretary of the navy says: "The possession of portions of the enemy's territory acquired by justifiable acts of war gives to us the right of government during the continuance of our possession, and imposes upon us a duty to the inhabitants who are thus placed under our dominion. The right of possession, however, is temporary, unless made absolute by subsequent

events. If, being in possession, a treaty of peace is made and duly ratified on the principle of *uti possidetis;* that is, that each of the belligerent parties shall enjoy the territory of which it shall be in possession at the date of the treaty; or if the surrender of the territory is not stipulated in the treaty so ratified, then the imperfect title so acquired by conquest is made absolute, and the inhabitants of the territory are entitled to all the benefits of the federal constitution of the United States to the same extent as the citizens of any other part of the union. The course of our government in regard to California, or other portions of the territory of Mexico, now or hereafter to be in our possession by conquest, depends on those on whom the constitution imposes the duty of making and carrying treaties into effect. Pending the war our possession gives only such rights as the laws of nations recognize, and the government is military, performing such civil duties as are necessary to the full enjoyment of the advantages resulting from the conquest and to the due protection of the rights of persons and of property of the inhabitants. No political rights can be conferred on the inhabitants thus situated emanating from the constitution of the United States. That instrument establishes a form of government for those who are in our limits and owe voluntary allegiance to it. Unless incorporated with the assent of congress by ratified treaty or by legislative act, as in the case of Texas, our rights in our enemy's territory in our possession, are only such as the laws of war confer, and no more than are derived from the same authority. They are, therefore, entitled to no representation in the congress of the United States."

Now, as it was the object of the dispatch to correct the errors which had been committed in the organization of civil government here, and as no error is specified or pointed out in the dispatch but that of giving the people of this territory a representation in the congress of the United States, it is but rational to conclude that none other existed in the laws or form of government adopted for this territory. That the error alluded to did not consist in permitting the people

to elect agents to assist in the making or the execution of the laws for the government of the people is evident from the following paragraph from the same dispatch:

"In the discharge of the duty of government in the conquered territory during our military possession, it has not been deemed improper or unwise that the inhabitants should be permitted to participate in the selection of agents to make or execute the laws to be enforced. Such a privilege can not fail to produce ameliorations of the despotic character of martial law, and constitute checks, voluntarily and appropriately submitted to by officers of the United States, all whose instructions are based on the will of the governed. I have regarded your messages in authorizing the election of agents charged with the making of laws or in executing them as founded on this principle, and, so far as they carry out the right of temporary government under existing rights of possession, they are approved, but no officers created or laws or regulations made to protect the rights or perform the duties resulting from our conquest, can lawfully continue beyond the duration of the state of things which now exist, without the authority of future treaty or act of congress."

Upon the subject of the duration of such temporary government, the president, in his message of July 24, 1848, says: "On the conclusion and ratification of a treaty of peace with Mexico, which was proclaimed on the fourth instant, these temporary governments ceased to exist." From this view of the subject we infer that the legislative assembly which convened in December, 1847, was a lawful law-making agent of the military commandant of this territory, and that the acts passed by said assembly were valid when approved by said military commandant, so far as they did not confer on the inhabitants political rights emanating from the constitution of the United States. That the laws passed at the December session, 1847, of the general assembly of the territory of New Mexico, were approved by the commanding general of this territory will appear by the following order:

[Special Order No. 5.]
          HEADQUARTERS NINTH MILITARY DEPARTMENT, ⎱
               SANTA FE, N. M., February 5, 1848.     ⎰

The foregoing legislative enactments of the territory of
New Mexico having been duly reviewed by the commanding
general of the territory, they are hereby approved and will
be duly observed.     By order of
                    Brigadier-General STERLING PRICE.
     W. E. PRINCE, A. D. C. & Adj.-Gen.

The Kearny code and the acts of the December session,
1847, of the general assembly of the territory of New Mexico
were valid with the restriction above alluded to with re-
gard to political rights under the constitution of the United
States.

But it is suggested, that as the temporary government
established here ceased to exist on the conclusion and ex-
change of ratifications of a treaty of peace with Mexico, the
laws passed by said temporary civil government ceased to
exist also, unless perpetuated by the treaty itself.     There
is nothing in the treaty upon this subject, except what is
contained in the first paragraph of the ninth article, which
is as follows: "The Mexicans who, in the territories afore-
said, shall not preserve the character of citizens of the Mex-
ican republic, conformably with what is stipulated in the
preceding article, shall be incorporated into the Union of
the United States and admitted as soon as possible, accord-
ing to the principles of the federal constitution, to the en-
joyment of all the rights of citizens of the United States.
In the mean time they shall be maintained and protected in
the enjoyment of their liberty, their property, and the civil
rights now vested in them according to the Mexican laws.
With respect to political rights, their condition shall be on
an equality with that of the inhabitants of the other terri-
tories of the United States, and at least equally as good as
that of the inhabitants of Louisiana and the Floridas, when
these provinces, by transfer from the French republic and
crown of Spain, became territories of the United States."

Now, civil rights are those which have no relation to the
establishment, management, or support of the government.

These consist in the power of enjoying and acquiring property, of exercising the paternal and marital powers and the like: See Bouv. Law Dict., vol. 2, tit. Rights, p. 475. We do not consider that the treaty in fact provided any system of government for the ceded territory, but only provided that civil rights that had been legally vested by the Mexican laws in Mexican citizens, who for the future should be American citizens, should not be taken away from them, and such would have been the law if nothing had been said about it in the treaty. During the war the temporary civil government established here was a government *de jure*. Under the laws of nations, after the ratification of the treaty, the civil government went on, not as a government *de jure*, but as a government *de facto* under the laws of nations, and tacit assent at least, of the congress of the United States and the people of this territory. The treaty of peace, by the cession of New Mexico to the United States, changed the jurisdiction and sovereignty over this territory from the republic of Mexico to the United States. But it had no effect, nor was it intended to have any effect, upon the system of government prevailing or laws in force at the time of the cession. It has been well settled by the authority of adjudged cases that the laws, usages, and municipal regulations in force at the time of the conquest or cession remain in force until changed by the new sovereign: Calv. Cus. 7, 60, 17; *Campbell* v. *Hall*, 1 Cowp. 209; 9 Pet. 711, 734, 748, 749; *Strother* v. *Lucas*, 12 Id. 410.

The situation of California and New Mexico were identical, so far as these temporary governments were concerned, and the intervention of some time between the conclusion of peace and the extension of the laws of the United States over them. Now, if congress alone had authority to legislate for California and New Mexico, and for some time did not do so, until congress did legislate, the government and laws existing at the date of the treaty, would still exist and continue until changed by the new sovereign, the United States. This view of the case is sustained by the president in his message of twenty-first of January, 1850, in which he says: " On coming into office, I found the military commandants.

of the department of California exercising the functions of civil government in that territory; and, left as I was to act under the treaty of Guadalupe Hidalgo, without the aid of any legislative provisions establishing a government in that territory, I thought it best not to disturb that arrangement made under my predecessor until congress should take some action on the subject. I, therefore, did not interfere with the powers of the military commandant, who continued to act as civil governor as before; but I made no such appointment, conferred no authority, and have allowed no increased compensation to the commandant for his services."

The same thing might have been said with regard to New Mexico. That the laws in force at the time of the treaty continued, and that the form of civil government in existence continued as a government, is admitted and defended by Honorable James Buchanan in a letter from the department of state, dated October 7, 1848, addressed to William V. Voorhees, Esq. Mr. Buchanan, after expressing the deep regret of the president at the failure of congress to establish a territorial government for California, says: "In the mean time the condition of the people of California is anomalous, and will require on their part the exercise of great prudence and discretion. By the conclusion of the treaty of peace, the military government, which was established over them under the laws of war, as recognized by the practice of all civilized nations, has ceased to derive its authority from this source of power. But is there for this reason no government in California? Are life, liberty, and property under the protection of no authorities? This would be a singular phenomenon in the face of the world, and especially among American citizens, distinguished as they are above all other people for their law-abiding character. Fortunately, they are not reduced to this sad condition. The termination of the war left an existing government—a government *de facto*—in full operation, and this will continue with the presumed consent of the people until congress shall provide for them a territorial government. The great law of necessity justifies this conclusion. The consent of the people is irresistibly inferred, from the fact that no

civilized people could possibly desire to abrogate an existing government when the alternative presented would be to place themselves in a state of anarchy, beyond the protection of all law, and reduce them to the unhappy necessity of submitting to the dominion of the strongest."

Similar in this respect was New Mexico to California, and the above views are equally applicable to both. The Hon. John M. Clayton, in a letter from the department of state, dated the third of April, 1849, addressed to the Hon. Thomas Butler King, expressed similar views to those of Mr. Buchanan. Mr. Clayton says that the laws of California and New Mexico, as they existed at the conclusion of the treaty of Guadalupe Hidalgo, regulating the relations of the inhabitants with each other, will necessarily remain in force in those territories; their relations with their former government have been dissolved, and new relations created between them and the government of the United States; but the existing laws regulating the relations of the people with each other will continue until others lawfully enacted shall supersede them. The naval and military commanders on these stations will be fully instructed to co-operate with the friends of order and good government so far as their co-operation can be useful and proper. It is evident that General Price did not regard the dispatches of January 11, 1847, from the war and navy departments, as prohibiting him from using the assistance of the legislative assembly in the making of the laws, or he would not, with these dispatches before him, have approved the laws passed by the general assembly of the territory at the December session, 1847. If this view of the case be correct, the replevin act of December, 1847, was passed by a lawful agent of the commanding general of the territory, and was by him approved, and is, therefore, a valid law, in force in this territory on the fourteenth day of July, 1851, and by an act of the legislative assembly of the territory of New Mexico of that date continued in force.

No actual possession or visible exercise of sovereignty over New Mexico was ever perfected by the state of Texas, and the claim in dispute between her and the Unites States

has been finally settled, leaving the United States her laws and the temporary government by her established, in undisturbed operation. No further notice need be taken of this inchoate claim of Texas, which has been satisfactorily extinguished. We will now proceed to consider the other points in this case.

The third section of the acts of the legislative assembly in regard to the action of replevin reads as follows: "Before the writ of replevin be issued, the plaintiff, or some credible person in his stead, shall file in the office of the clerk of the circuit court an affidavit alleging that the plaintiff is lawfully entitled to the possession of the property mentioned in the declaration; that the same was wrongfully taken or wrongfully detained by the defendant, and that the right of action accrued within one year:" See Laws of the Territory, sec. 3, p. 413.

George Merritt, as agent of the plaintiff Ward, filed the affidavit required by said section. Section 4 of the same act reads as follows: "The plaintiff, or some responsible person, shall, before the execution of the writ, enter into bond, with sufficient securities to the officer to whom the writ is directed, in double the value of the property, conditioned for the prosecution of the suit with effect and without delay; make return of the property, if a return is adjudged; keep harmless the officer and pay all costs that may accrue." The bond required by this section was executed by George Merritt, as agent for James N. Ward as principal, and Ceran St. Varain and James H. Quinne as securities. The seventh section of the same act reads as follows: "In case the plaintiff fails to prosecute his suit with effect and without delay, judgment shall be given to the defendant and shall be entered against the plaintiff and his securities for the value of the property taken, and double damages for the use of the same from the time of delivery, and it shall be in the option of the defendant to take back such property or the assessed value thereof."

The defendant Broadwell pleaded not guilty to the petition and the cause was tried by a jury at the June term,

1853, of the district court; and in conformity with the section last mentioned, a judgment was rendered on said trial against Merritt, St. Varain, and Quinne, for the value of the property and damages and costs. From this judgment the plaintiff Ward takes an appeal to this court. The record in this case, after noticing the appearance of the parties, impaneling of a jury, and the submission of the issue to the jury, reads as follows: "Whereupon the said plaintiff fails to prosecute his said suit further, and thereupon the jury is discharged from further consideration in the premises; therefore it is considered by the court that the said defendant go hence without day and recover of the said plaintiff George W. Merritt, Ceran St. Varain, and James H. Quinne, his securities, his damages by reason of the premises." A jury was then called, and the value of the property assessed at one hundred and twenty-five dollars, the damages at thirty dollars, and a judgment rendered against them for the value of the property, damages, and costs. There was a motion made and overruled to set aside the nonsuit, and grant a new trial, for the alleged reason that the court erred in excluding George W. Merritt as a witness in the case. The circumstances under which said witness was presented to the court and excluded from giving evidence, are contained in the following bill of exceptions, to wit: "Be it remembered that on the trial of the above-entitled cause, the plaintiff offered George W. Merritt, principal on the replevin bond as agent of plaintiff, as a witness in this case; said witness was sworn on his *voir dire*, and stated that he had no interest in the event of said suit; that he had only acted as agent for Ward in bringing the suit and filing the bond; and that witness considered himself indemnified for all loss he might sustain in the case. Plaintiff then offered to substitute another person on the bond in place of said Merritt, but the court refused to permit the substitution of another person in place of said Merritt, and refused to permit said Merritt to testify in said cause; to which refusal on the part of the court to permit said witness to testify, the plaintiff by his counsel excepts, and files herewith his bill of exceptions, and prays

that it may be signed, sealed, and made a part of the record in this case, which is accordingly done," etc.

The appellant in this case insists that the court below erred in refusing to permit Merritt to testify for the plaintiff, and also in refusing to permit the plaintiff to substitute another person on the replevin bond in the place of Merritt. The appellee contends that the judgment in this case is nothing but a voluntary nonsuit, from which the plaintiff below could not appeal; that Merritt was properly excluded from giving evidence in the cause, for the reason that he was a party to the suit, and had a direct pecuniary interest in the result of the suit then pending, and that the question of substitution was a matter of discretion with the court below, not properly the subject-matter of a review in this court. The authorities are clear, that a voluntary nonsuit can not be made the subject of error. See the following cases: *Collins* v. *Nichols et al.,* 2 M. R. 132; *Union Bank* v. *Carr,* 2 Humph. 345–346; *Worke* v. *Byers,* 3 Hawks, 228. A judgment of nonsuit is based upon the presumption that the party is called, does not answer, and elects to go out of court with a judgment for costs against him, leaving the merits of the controversy open for investigation in a subsequent suit. The parties in this case have chosen to call this judgment in the case now under consideration a nonsuit.

But the court has arrived at a different conclusion. The judgment in this case in the court below is a final judgment against the plaintiff, and in favor of the defendant, for want of prosecution of the case with effect upon the part of the plaintiff. It gave to the defendant all he could ask: the value of the property replevied by the plaintiff, and double damages and costs. We do not perceive what additional elements of finality could be added to this judgment. If this were not the correct view of the legal effect of the judgment in this case, still we are not prepared to admit, even if the judgment in this case could be considered a nonsuit, that it was voluntary on the part of the plaintiff below. Where a party has been compelled to abandon his case in consequence of an adverse decision of the court, to which

he excepts, upon a vital point in his cause, we are by no means prepared to concede that his action was voluntary. The plaintiff below was not then precluded from appealing his cause to this court for review.

It is contended by the appellee, that Merritt, the witness offered to be examined, was a party to the record, and from that fact alone, aside from the question of interest, was incompetent as a witness. This question was before this court at the January term, 1852, in the case of *Pino* v. *Beckwith, ante,* and it was then decided, in accordance with the authorities there cited, that "a party on the record, although divested of all interest in the event of the suit, is not a competent witness in the cause."

But in the case now before the court, we do not consider the witness Merritt, at the time he was offered as a witness, to have been a party to the suit on the record. The case stood on record as *Ward* v. *Broadwell,* and the mere circumstance that Ward, by failing to prosecute his suit with effect, might place the witness Merritt in a position which would authorize the court below to render a judgment against him, if that act could be enforced by the court, is not alone sufficient evidence that he, Merritt, was then a party to the record. Where the fact of whether a party be a party to the record or not depends upon the happening of a future event which may or may not take place, such person ought not to be regarded as a party to the record until such future event has happened. When a witness is presented in court for examination and his evidence objected to on the ground of interest, there are two methods by which it may be proven: 1. By examining said witness on his *voir dire.* 2. By proving his interest *aliunde.* But the principle of law is well established, that you can not resort to both of these modes at the same time. In support of this position, see the following cases: *Mifflin* v. *Bingham,* 1 Dall. 272; *Mallet* v. *Mallet,* 1 Root, 501; *McAllister* v. *Williams,* 1 Overt. 107, 119; *Bridge* v. *Wellington,* 1 Mass. 219; *Chance* v. *Hine,* 6 Conn. 231. In the case of *Dorr* v. *Osgood,* 2 Tyler, 28, it was decided by the court that if a witness is put on his *voir dire,* as to his interest, and

purges himself, evidence to show his interest *aliunde* is not admissible either at that trial or on a motion for a new trial. The objecting party having made his election of proof, shall not afterward use another mode. The same principle was decided in the case of *Bisbee* v. *Hall*, 3 Ohio, 449. In the case now before us, the party objecting to the competency of Merritt as a witness upon the ground of interest in the event of the suit, elected to examine him respecting that interest on his *voir dire*. On such examination, Merritt stated that he had no interest in the event of said suit; that he had only acted as the agent of Ward in bringing the suit and filing the bond, and that witness considered himself indemnified for all loss he might sustain in the case.

Notwithstanding the witness considered himself uninterested in the suit, we think the court below was right in coming to the conclusion, from the facts stated by witness, that he was in fact interested in the event of the suit in such a manner as rendered him incompetent to testify while that interest continued to exist. We look upon Merritt, St. Varain, and Quinne, as all sureties for Ward, and as having by the replevin bond bound themselves that Ward should prosecute his suit of replevin with effect and without delay, and on his failure to do so, that he, Ward, would pay the assessed value of the property, double damages, and costs to the defendant Broadwell. That Merritt had, as the security of Ward in the replevin bond, such a direct, immediate, and subsisting pecuniary interest in the event of the suit then pending, as would exclude him as a witness, is too clear to need authority or argument to unfold it. Many authorities have been referred to in the argument of this case by the appellant's counsel touching the disqualification of a witness, upon the ground of interest in the event of a suit, and of the duty of courts to permit said interest to be released.

We do not consider it worth while to consider that feature of the case, for the reason that the record does not disclose that any person either executed, or offered to execute, a release to Merritt of his interest in the suit. The bill of exceptions in this case further states that the plaintiff of-

fered to substitute another person on the bond ·in place of said Merritt, but the court refused to permit the substitution of another person in the place of said Merritt. It is argued by the counsel of the appellee that the question of substitution was one addressed to the discretion of the court below, and is not receivable in this court. We think differently. The discretion of a court must always be exercised in conformity with law, and the usages of courts, and if not so exercised, is susceptible of being reviewed in a superior tribunal upon the question of such substitution of a new surety in lieu of the one offered as a witness, we are not without the light of adjudicated cases to guide us. Phillips on Evidence, vol. 1, p. 89, says: "A surety on a replevin bond is interested in procuring a verdict for the plaintiff, in the same manner as bail are interested in procuring a verdict for the defendant, and is therefore incompetent; but if his testimony be required, the courts will permit the substitution of a new surety in lieu of the witness, in order that the latter may be rendered competent." The same principle was decided in the case of *Bailey* v. *Bailey*, 1 Bing. 92; also, S. C., 7 Moore, 439.

We can not perceive how any injury would result to the defendant in the court below by permitting the substitution to be made. We can perceive how the plaintiff in the court below might lose a just and meritorious cause upon the refusal of the court to permit the substitution of a new surety in lieu of the witness offered. In the refusal of the court below to permit the plaintiff to strike out the name of Merritt and substitute a new surety in his place, we think the court erred, and the judgment must be reversed.

DEAVENPORT, C. J., dissenting:

This is an action of replevin instituted by the appellant against the appellee in the court below under the laws of this territory: *Vide* Laws of New Mexico, 114. The affidavit, as well as the bond required by the provisions of the statute, were both made by George Merritt. Upon the trial of this case below, said Merritt was tendered by the plaintiff as a witness, and objections were made as to his

competency, on the ground of his signature to said bond. These objections were sustained by the court. The plaintiff proffered then to relieve said Merritt from his incompetency by substituting another person in his stead, and releasing him from said bond. To this' release and substitution objection was also taken, and the court below sustained the same. The plaintiff thereupon suffered a nonsuit, whereupon the defendant obtained a judgment against the plaintiff and obligors to said bond for the value of said property taken, and double damages for the use of the same. Afterwards the plaintiffs entered a motion to set aside the nonsuit, which motion being overruled, exceptions were taken, and the case brought to this court for review.

It is insisted in argument, that this being a case of voluntary nonsuit, no appeal will lie. I do not conceive it to be a case of voluntary nonsuit; but rather, one where the plaintiff, on account of his witness being ruled to be incompetent, was constrained to such a course, considering it then as being one of rightful appeal. I shall proceed to notice only such grounds of error as those upon which I differ with the opinion delivered. Courts should ever be guarded, while expounding the laws of one country, and in too readily adopting the decisions made in others upon a like subject, against that species of adjudication which may impose those foreign laws upon the people without their legislative sanction, and especially in the United States, where each state has its separate laws, differing one from the other so much in detail, although they may pertain to the same subject-matter of legislation.

To exemplify this, I will only instance that it is a universal rule of construction, that all remedies created by statute in contravention of the common law remedies are to be construed strictly. But in some of the states statutory remedies are created, and by the laws of those very states it is expressly enacted that they shall be construed liberally. In those states where these remedial statutes exist, then, these statutory remedies are construed with reference to them. But when such remedial statutes do not exist, then the

common law rule of strict construction prevails, and proba-
bly in almost every decision where there is a departure from
the common law rule, it will be found that such departure
is founded on some particular enactment which authorizes
it.   Is there any statute in this territory which authorizes
the court to depart from the common law rule of construing
all statutory remedies in contravention of common law reme-
dies strictly ?   I know of none.   Then, testing this case by
this rule, I shall proceed to point the difference which ex-
ists between the majority of the court and myself in refer-
ence to the power of the court to release said Merritt from
his bond in this case, and substitute another person in his
stead, in order to render him a competent witness.   The
fourth section of the replevin act is as follows: "The
plaintiff, or some responsible person, shall, before the exe-
cution, enter into bond with sufficient securities, to the offi-
cer to whom the writ is directed, in double the value of the
property, conditioned for the prosecution of the suit with
effect, and without delay; make return of the property, if
return is adjudged; keep harmless the officer, and pay all
costs that may accrue."

Now this section clearly points out and makes it a prece-
dent step in this statutory form of action, that before the
writ shall be served, or, in other words, before the defend-
ant's possession to the property can be disturbed, the
plaintiff, or some responsible person, shall enter into bond,
etc.: *Vide* Laws of Territory, 413.   Either the plaintiff or
some responsible person may enter into such bond with
sufficient securities.   He did so.   Now the question arises,
what relation does Merritt, as such responsible person,
bear toward the plaintiff and his own securities for the pur-
pose of this suit?   I hold that both Merritt and his securi-
ties are the securities of the plaintiff, and upon the plaint-
iff's failure to prosecute his suit, that judgment may be
rendered against plaintiff and all the parties on the replevin
bond: *Vide* seventh section of replevin act, Laws of the Ter-
ritory, 413.   But as between Merritt, as the responsible per-
son in such bond, does he not stand in reference to his
securities as principal?   As between him and them, does

he not stand as their principal, and they as his securities? By reference to the attachment act of the territory, Laws of Territory, p. 39, sec. 4, it will be seen that the bond there required may be entered into by the plaintiff, or some responsible person as principal, with two or more securities, etc. I refer to this clause in the attachment law, to show that there the responsible person is expressly termed principal, and that the mere omission of the word in the replevin act does not make the responsible person in a replevin bond less a principal on that account. What is meant by the term responsible person, and why is this term used in the law? It is evident that these actions, being extraordinary, created by statute in contravention of the common law remedies, and when the property of the defendant is seized, that the law intended that when any person resorted to them, the defendants should have some responsible person bound for all the damages he might suffer from the wrongfully suing out of such writs. The mere circumstance of the bond being payable to the officer amounts to nothing as a conclusion against its being for the benefit and protection of the defendant, as the tenth section of said act shows that defendant may sue upon it: *Vide* Laws of Territory, 414. The responsible person I then deem is the principal in the bond, and those who signed it with him, are, *quoad* said bond, his sureties, being his securities. Now, if another person is substituted in place of such responsible person, are not his securities released, and does not the bond wholly fail? Such seems, to my mind, the inevitable result, as the statute requires such responsible person shall enter into bond with sureties. These securities can, if that responsible person is released and another substituted, avail themselves of the plea that they never bound themselves for securities of such substituted persons. If this be so, I can not perceive how it can be considered error for the court below to refuse such release and substitution. If such substitution would amount to a release of the securities, would not that annul the bond?

Whether the plaintiff would have the right to substitute an entirely new bond, is a very different question, which is

not raised by the record before us; and I think the safer course for appellate courts is to confine themselves to the decisions of only such questions as arise upon the record. I think I have demonstrated in this case that George Merritt, *quoad* the bond, can only be regarded as a principal, and that his release, and the substitution of another person in his stead, would discharge the securities to said bond. If such be the fact, I can not perceive how the doctrine of the power of the courts to release securities in certain cases, to render them capable of testifying, can be made applicable to a principal on a bond.