## James Pepper et al. *v.* R. G. Dunlap.

The patent for lands issued under the authority of the United States, is conclusive evidence of their
severance from the public domain, and of the divestiture of title from the United States, which may
have remained in them notwithstanding a sale and receipt of the price by its officers. But the
issuing of the patent does not affect any rights subsisting between third persons and the patentee,
growing out of contracts in relation to the land covered by the patent. The patent, to whomsoever
issued, inures to the benefit of the party to whom the patentee is bound to convey it, or for whose
use he ought in law to hold it.

The vendor being without fraud—the vendee cannot resist the payment of the price for defect of
title, when he himself has perfected the title by improper and deceitful means—the object of
which was to prevent the recovery of the purchase money. Under such circumstances, the ven-
dee is only entitled to a credit for the money paid by him to perfect the title.

It is true there is a statute of the United States against the survey and settlement of the public
lands, by individuals, passed in 1840. But since that period, the policy of the government on this
subject, has been entirely changed, and has tended to encourage actual setlers on the public lands;
and the several preemption Acts, and those for the relief of settlers, are in this sense, and the whole
legislation of Congress is in that direction. It seems to be a necessary consequence of this policy
on the part of the government, that courts, in determining on the rights of individuals under it,
should act concurrently with it.

C. C. 3417, 3420, 3433, 3487, 3465, 3466.

Under the Spanish law, property could be acquired by prescription against the crown. At least, we
find no exception in its favor, nor any principle which prevents the operation of the laws of pre-
scription. Under our Code we find no express exception in favor of the State.

APPEAL from the District Court of the Parish of Madison, *Perkins*, J.
Stockton & Steele, for plaintiffs and appellants. *Bemiss, Stacy & Sparrow*,
and *Snyder*, for defendant.

Eustis, C. J. The litigation between certain parties now before us, and
which we shall consider under the title of *Pepper and others* v. *Dunlap*, com-
menced as far back as 1839. The suit has been three times before our prede-
cessors, and is reported in 16th Louisiana Reports, 163; 19th id. 163; 9th
Robinson's Reports, 283: it was before this court in 1850, and is reported in
5th Annual Reports, 200.

The suit originated in an order of seizure and sale, issued on certain mort-
gage notes given by *Richard G. Dunlap* to *James Pepper and others*, for a
tract of land and negroes. It is not material to note the details of this compli-
cated litigation. It is sufficient for all the purposes of the present inquiry, to
state that the cause, by the judgment of this court, was remanded for the pur-
pose of having certain issues of fact made up and tried. They have been ac-
cordingly determined, and the verdict of the jury and the judgment of the
court below are against the plaintiffs, who have taken this appeal.

The judgment rescinded the sale of a portion of the tract of land sold,
known and described as section 22, and allowed the defendants fifty dollars per
acre for the quantity. The controversy, it is conceded, is narrowed down to
the single point of the rights of the parties in relation to the title to this sec-
tion.

The title to this section, it is contended, and so the verdict has determined,
does not belong to the succession of either of the brothers *Dunlap*, both of
whom have died since the institution of this suit, but is still outstanding and is
vested in *McKiernan*, who is the brother-in-law of the late *H. W. Dunlap*.

Note.—This case was accidently omitted in the last volume.

After the original order of seizure and sale was granted against the property in the possession of the purchaser, the late *R. G. Dunlap*, he sold his interest in it to his brother, *H. W. Dunlap*.

The investigation of the rights of *McKiernan*, as to this section, involves the whole controversy between the parties in interest before us.

The Supreme Court thought it was incontestable that *James James*, under whom the plaintiffs' vendors set up title, never had any title to this section, founded upon any confirmation of claim, either by settlement, right, or otherwise, under the Spanish or American Government. On the contrary, it appeared that his pretentions to the land were rejected by the land commissioners as unsupported by evidence, according to the Act of Congress, and that it formed a part of the public lands of the United States. The court was also of opinion, that no title by prescription was vested in the plaintiffs' vendors. 9th Robinson, 286.

As the case was remanded for a new trial, without any conclusive decree on this question of title, the matter is still open for adjudication, and as we have not concurred with the late Supreme Court on this point, it is proper that we should state the grounds of our opinion.

It appears that the claim of *James James* to this land was rejected by the Land Commissioners for want of testimony, and has never been confirmed. In the report of the Commissioners to the Secretary of the Treasury, made in the year 1812, the claim of *James*, for another tract of a less quantity of land, situated in the county of Concordia, was confirmed. It is stated in the original notices of claims in the land office at Opelousas, that these claims were for the same land, according to the plats filed; but this fact is not established, nor is there any written evidence of this claim, except this note of it in the land office.

It appears further, that this confirmed claim for 433 acres, was located upon this section 22, which is in township 16, and was so returned on the township maps to the general land office. In 1842, this location, on the report of the Surveyor General, was declared to be improperly made, and the tract to be public land, and was directed to be surveyed and laid out in lots corresponding with the adjacent land. This was accordingly done.

The Commissioner of the land office, in a letter to the Register and Receiver at the land office of the district, thus describes the condition of this business :

" The first mentioned section (22) was erroneously surveyed as the confirmation of *James James*, and the latter as the back concession of said confirmation. This error being discovered, the Surveyor General was directed to subdivide those sections, so that they might be disposed of as public land. You will therefore permit the entry by those claimants, if by the proof filed, they shall show themselves entitled to the benefit of said law, that of 4th September, 1842. As the land was not returned to your office as public lands until after the 22d June, 1842, claimants under the Acts of 1838, 1840, (should there be any,) were prevented from proving up and paying for their claims before that time, and may secure their land by making proof thereof and payment for the same, at any time within a year after the receipt by you, of a plat of those sections. *This fact is mentioned*, because," &c.

By the proceedings of the House of Representatives of the United States, it appears that in 1843, the plaintiffs had applied to Congress for a confirmation of their entry of the back concession adjoining this section twenty two.— This entry was based upon their right of ownership of the front section, about

which much confusion existed as to the location, which it is difficult to solve, and even not easy to explain. It seems that the confirmed claim was located upon this section, and for the quantity and location called for by the unconfirmed claim; at all events there is no mention or note made of any short quantity. The entry of the back concession was confirmed to the plaintiffs by an Act of Congress. The committee of private land claims make this statement in reference to the location :

" From the correspondence of the Commissioner of the General Land Office on this subject, it appears that section 22d is laid down on a township plat, approved by the Surveyor General, Gideon Fitz, on the 11th of April, 1831, in the name of *James James ;* and also in a similar manner on a plat previously approved by Surveyor General Turner; that there is no evidence on file to show why this private claim was erroneously located; that the present Surveyor General appears to assign no other reason for setting aside the location, than that it is already located in adjoining townships."

The committee came to the conclusion, that the plaintiffs were in good faith in making the entry, but that the Commissioner acted correctly in canceling the entry of the back concession, and declaring the front tract to be public land.

The testimony adduced on the trial of this cause, establishes the fact, that *James James* lived on this land from the year 1805 or 1806, until his death, in 1823, except when prevented by inundation at three several times. At one time he returned the same year; at the second, a year or so after; and the third time, it was two years before he returned. The wife of *James James* continued to reside on the place after his death. Afterwards it appears that *Aaron Lilly*, who had married one of the daughters of the deceased, bought out the interest of one of the heirs, and held and improved the property until 1831, when he sold it to *Cicero Jefferson*, otherwise named *Joseph Pepper*, under whom the plaintiffs claim.

It appears that in 1816 or 1817, the bayou, a portion of which was through a corner of this tract, was then and is now known as James' Bayou. No question is made as to the continuous possession of *Joseph Pepper* and the defendants, *Dunlap*.

On the 18th of June, 1842, the Commissioner of the General Land Office, having been satisfied from evidence before him, that the claim of *James James*, B. No. 15, had been improperly located and laid down on this section 22, and that the tract was public land, directed the Surveyor General to have it surveyed and laid off into lots corresponding with the adjacent land, and to return plats thereof to his office, and the land office at Monroe. This was accordingly done; the tract was thus declared to be public land of the United States, and subject to entry as such.

On the 4th of February, 1843, patents were issued to *C. B. McKiernan, W. A. Greesham, John Bartlett*, and *R. W. Burney*, for this section under the preemption Act of September 4th, 1841. *McKiernan* subsequently purchased the three-quarter sections, and now holds, under the United States, title to the whole section. This is the outstanding title which caused the disallowance of a portion of the price, by the verdict of the jury.

It appears that this section 22, was laid down in the name of *James James*, confirmation not found, on the township plat in the general land office, approved by the Surveyor General as far back as 1828, and on two other plats in said office, returned from Surveyor's General in 1829 and 1831.

We will now proceed to consider what effect the law gives to the title of the plaintiffs conveyed to the defendant, *Dunlap*, under the facts disclosed.

The patent for lands issued under the authority of the United States, is conclusive evidence of their severance from the domain and of the divestiture of the title from the United States, which may have remained in them, notwithstanding a sale and a receipt of the price by its officers; but we have never understood that the issuing of the patent affected any rights subsisting between third persons and the patentee, growing out of contracts in relation to the land covered by the patent. The patent, to whomsoever issued, inures to the benefit of the party to whom the patentee is bound to convey it, or for whose use he ought in law to hold it.

Notwithstanding the technical effect assigned under the laws and jurisprudence of the United States to patents, as constituting the perfect title to lands, our jurisprudence has, from the origin of our courts, been conversant with equitable and imperfect titles to land. Indeed, a large portion of the cultivated lands of the State have been held for long periods by titles other than those of complete grants, patents or confirmations by Act of Congress, and to exclude them from contracts and the laws incident to other species of property, would have been impossible under an organized government.

The receipts of the Receivers of public moneys for the price of lands, have been held to be sufficient evidence of title to constitute the basis of the petitory action, and courts have been under the necessity of dealing with this class of imperfect titles, notwithstanding the outstanding title of the United States, in conformity with our laws relating to the ownership and possession of real property.

It is true, there is a statute of the United States against the survey and settlement of the public lands of the United States, by individuals, passed in 1804. But since that period, the policy of the government on this subject, has been entirely changed, and has tended to encourage actual settlers on the public lands, and the several preëmption Acts and those for the relief of settlers are in this sense, and the whole legislation of Congress is in that direction. It seems to be a necessary consequence of this policy on the part of the government, that courts, in determining on the rights of individuals under it, should act concurrently with it.

Under our Code, the rights common to all possessors in good or bad faith, are, that they are considered provisionally, as owners of the thing which they possess, as long as it is not reclaimed by the true owner or person entitled to reclaim it, and even after such reclamation, until the right of the person making it is established; that every person who had possessed an estate for a year, or enjoys peaceably and without interruption a real right, and is disturbed in it, has an action against the disturber, either to be maintained in his possession or to be restored to it in case of eviction, whether by force or otherwise. Art. 3417, §§1 and 2. And that such a possession may, by prescription, acquire the property of the thing which he thus possesses, after a certain time, as he is possessed, in good or bad faith. Id. § 3.

Prescription is one of the modes of acquiring property by the effect of time and under the conditions regulated by law. Code, 3420.

There are no other prescriptions than those established by the Code. 3433.

Prescription runs against all persons, unless they are included in some exception established by law. Code, 3487.

The property of immovables is prescribed for by thirty years, and that of slaves by fifteen years, without any need of title or possession in good faith. Code 3465. The possession necessary for this prescription, must be public and unequivocal, continued and uninterrupted, and under the title of owner. Code, 3466.

Under the Spanish law, property could be acquired by prescription against the crown. At least, we find no exception in its favor, nor any principle which prevents the operation of the laws of prescription. *Sanchez* v. *Gonzales*, 11 M. R. 210. *Mitchell* v. *U. S.*, 9 Pet. 760. Partida 3, title 29, law 18.

Under our Code, we find no express exception in favor of the State.

Conceding, for argument sake, that the settlers on the public lands of the United States can acquire no title by prescription, to defeat the ownership of the United States (*Jourdan* v. *Barrett*, 4 Howard Rep. 184); nevertheless, as this land has been in the undisturbed possession of the plaintiffs, and those in whose right they hold under the recorded surveys of the public officers of the United States, it is not permitted under our jurisprudence, to consider the rights of parties in relation to the land, as absolute nullities, although these rights would be defeasable at the instance of the United States.

The decision of the Supreme Court in the case of *Bessy* v. *Pintado*, 3d L. R. 489, is, in many respects, applicable to the present. It exemplifies the doctrine which we have stated.

In 1814, the defendants sold to the plaintiff a tract of land containing 2150 arpents, which they held under a Spanish grant. In 1826, the claim was submitted to the Land Commissioners, who confirmed the title for 640 acres only.

The question was, whether this failure of the government to confirm the whole title, amounted to an eviction of the plaintiff, and gave him a right of action for the recission of the sale. The case arose under the old Code. The court observes:

" The claim which the United States may hereafter advance to this land, and enforce, cannot be satisfactorily distinguished as to its influence on the rights of the parties before us, from that of a title outstanding in a private individual. It is true, they may proceed without suit and perhaps prescription does not run against them. But in the material and important fact, namely, that they have not evicted the vendee, and that it is not certain they ever will evict him, the cases are parallel. Had this suit been instituted before there was any decision by the Land Commissioners on the title, we suppose a doubt cannot exist that it would not have been maintained. Is the case so materially changed by what has been done in relation to that title, as to enable us to say, the vendee has lost the land? We think not. The vendees chance of obtaining the land is no doubt weakened, but destroyed it cannot be said to be. We have two many proofs of a change of policy in the government of the United States in relation to the public lands, too many instances of their liberality to enable us to say what disposition they may ultimately make of claims, such as that the plaintiff held under. At all events, while he remains in possession, he cannot be said to be evicted, and it is eviction, and not the right in others to evict, which can furnish ground to maintain this action.

It was contended the defendants sold nothing. They sold a tract of land embraced within certain limits, for which they had an inchoate title under the Spanish government. Had that government remained in possession of the country, it is probable they would have obtained a grant for it. Be that however

as it may, the sale was not void because the United States refused to confirm it. Sales under incomplete titles have been common in Louisiana for the last fifty years. They have always been considered to pass the land, subject like all other alienations to the influence of higher and better titles, if any such exist. This case offers nothing which makes it an exception to the general rule." *Miller* v. *Lelen*, 19 L. R. 331. *Griffen* v. *Cotton*, 1 Rob. 142.

On the former trial of this cause, we authorized the pleadings to be amended for the purpose of ascertaining all the facts in relation to the outstanding title to this section, under the impression that the plaintiffs possession and location under surveys, though precarious in relation to the United States, constituted a title adversely to other persons not claiming under them, which would devolve by descent, and might be the subject of a contract, and was subjected to the incidents of property.

It is hardly practicable within the limit of length which usage has assigned to a judicial opinion, to notice, in detail, the various parties with their pleadings which belong to this suit, and those with which it is consolidated. A very correct statement of all the proceedings, has been given in a well prepared brief of the counsel for the plaintiffs, and in considering the merits of this litigation, we will take up the subject in the order presented by the counsel for the defendants. It is stated in their brief, that there are but three questions before this court:

The first is, has there been a failure of the vendor's title to the section 22d?

The second, what amount of loss has accrued to the vendees by the loss of the section 22d?

The third is, was the title to section 22, acquired by *McKiernan*, obtained under such circumstances, that it inured to the benefit of the vendors.

The explanation we have given of the title of the vendors, is in response to the first question. There was a failure in the title of the vendors; the ownership of the land was in the United States and not in the vendors. At the same time, the vendors had the possession of the land with the sufferance of the United States, and had a title or right which could be disposed of, and could lawfully be the subject of the contract of sale, and, under this title, *Dunlap*, entered upon the land and possessed it, and there can be no doubt that, upon a proper application, the title would have been confirmed by Congress, upon the payment of the price of public lands, if the claim was not confirmed unconditionally.

The charge of deception and fraud on the part of the vendors, in relation to this subject of title, is not only repelled by the whole tenor of the evidence and the circumstances attending the sale, but it results from facts which are incontestible, that the purchaser, R. G. *Dunlap*, knew as much about the title and the ownership of the United States, as the vendors.

Months before the act of sale was passed, there was an agreement for this purchase, for which other lands were to be given in part payment by *Dunlap*, in which the subject of the title was thus provided for:

" Said *Pepper* is to give said R. G. *Dunlap*, a regular chain of titles for the aforesaid land and negroes, at the time he shall be paid the aforesaid fifteen thousand dollars, which titles, when produced, shall be deemed good and sufficient titles for said property, and paramount to all other titles."

Before the act of sale was passed, there was a payment made by *Pepper* to *Lilly*, on a bond given by the former to the latter, as the price of this section,

with the privity of *Dunlap*, and under circumstances which bring home to him the knowledge of the outstanding title of the United States.

In relation then to the question concerning the failure of title, there having been no deception practised on the purchaser by the vendors, it affords no ground, under the circumstances, for the refusal to pay any part of the price. The purchaser knew the danger of eviction, when he gave his notes, and also that the extinguishment of the title of the United States was a matter requiring time, and could only be effected in the ordinary course of congressional legislation.

On the second question, as to what amount of loss has accrued to the vendees by the failure of the title of this section, the answer is, the amount expended in good faith in perfecting the title, and no more. This is upon the supposition, that they have not been evicted, and we are brought to the consideration of the third question propounded by the counsel, whether the title to this section, set up by *McKiernan*, was obtained under such circumstances, that it inured to the benefit of the vendors.

Had there not been the verdict of a jury, which recognizes this title of *McKiernan*, we should have thought our duty discharged in stating our conclusion in relation to it ; we will, however, proceed to give the facts in detail, on which that conclusion is founded.

It appears that *George W. Copley, Esq.*, was one of the attorneys of *Dunlap*, employed in the defense of this suit ; that as early as 1840, or in the spring of 1841, he went to Donaldsonville on business connected with this suit. Being in Washington in July of that year, he addressed a letter to the Commissioner of the General Land Office, suggesting that the location of the *James James*' claim on this section 22, and the back concession, ought to be canceled, because it had been located elsewhere ; and Mr. *Copley* states in his deposition, that in his belief he was the immediate instrument that brought about the canceling of this location and the back concession. The object of his movement was to avoid, on the part of his client, paying for this land, as it was conceived by both of them, that the vendor had no just title to the land, and had conveyed none, and that it was unjust that *Dunlap* should pay for land to which his vendors had no title, and from which it was probable he would sooner or later be evicted. The witness says, that when it was declared public land, he *probably* suggested, that "it was subject to be preempted upon," and, he *thinks*, "the intimation was sufficient, and the first I knew, the parties above named, (*McKiernan, Greisham, Burney* and *Bartlett*) had settled on said land, and were making efforts to save it by preemptions. I made no charge for fees against the preemptors, or any one else, or at least I never considered that I did. I charged *Dunlap* a fee of $1000, for a large portion of which I held his note. I never considered that I had a right to charge, or that I had charged any one for any assistance I was to the preemptors in getting their claims through. My impression is, that it needed no one ; that they had plain sailing and got their claims through without difficulty, at least that has always been my understanding."

The diagrams of subdivision of this section were forwarded to the land office in Washington in July, 1842, and to the general land office in August of that year. The settlements for the purpose of preemption, were made in that month.

The Register and the Receiver at Monroe gave notice to the land office at Washington, that the section 22 was claimed by settlers under the Act of Con-

gress of September 4, 1841, who had filed proof of settlement and made a tender of payment, and that they had not permitted the entries, for the reason that the office at Monroe had not been officially informed that the section was subject to the claims of preëmptors and was public land.

The answer from the general land office directed, that the entries should be permitted on the claimants showing themselves entitled to the benefit of the law. This answer is dated the 9th of September, 1842.

There were four entries for this section. No. 1 was in favor of *Robert W. Burney ;* No. 2, in favor of *John Bartlett;* No. 3, in favor of *Charles B. Mc-Kiernan ;* and No. 4, in favor of *Walter A. Greisham.*

We have before us, by the testimony of his own agent, the purpose of *Dunlap* fully disclosed, which was to defeat the plaintiffs' claim for the purchase money of this section. The execution of the plan began at Washington, as we have seen ; it remains to notice what took place at the land office at Munroe, the residence of Mr. *Copley,* to which their operations were transferred.

The Register of that office says, in his testimony, that *Dunlap* was at Monroe twice during the year 1842. During his first visit, he inquired of us, the Register and Receiver, if our office had been furnished by the Surveyor General of Louisiana, with a plat of section 22 and 52, which was answered in the negative. He remarked, that he believed himself entitled to a preëmption of part of the section 22 ; to which the Register and Receiver did not assent. The only other persons who conferred with them in relation to this section, were *Bartlett, Greisham, McKiernan* and *Burney ;* the three first on the 17th of August, and the latter in October or November, 1842, &c.

*Dunlap* was in Monroe when Mr. *Copley* made application in behalf of *Mc-Kiernan, Bartlett* and *Greisham,* to enter the lots claimed by them, which was on the 21st of October. *Burney* was permitted to enter lot No. 1 on the 18th of November following. *Dunlap* was not then present, and the witness does not know whether *Burney* paid for the same or not.

The Receiver at Monroe, who was also examined as a witness, states that in August, *Greisham, McKiernan* and *Bartlett,* after filing their respective proofs and making a tender of payment, with the consent of the witness, deposited in his safe a sum of money, until it should be ascertained whether they would be permitted to make their entries. They informed him that *Copley* was their agent, and would attend to the making their entries when permitted. *Copley* did attend to their business and signed their applications to enter the lots, and he directed the Receiver to appropriate the money they had deposited for the payment of the same, which he accordingly did. *Dunlap* was in Monroe when *Copley* made the entries, but was not when *Burney* entered his claim.

*Dunlap* was not in Monroe when the first application was made in August, 1842.

The sum deposited in the safe of the Receiver was $800, the price not of three lots, but of four, and we infer from the testimony that it was appropriated as well for *Burney's* lot as for the other three, and that the payment was not made by *Burney* himself, but on his account.

The instructions from the general land office, made it necessary for the parties claiming the right of preëmption under the law of 1841, to show that no other person was settled on the same lands claimed by them, in order to entitle them to their preëmption. *Dunlap* filed his affidavit in each claim, which in the opinion of the Register and Receiver, removed *all obstacles* in their way, and they then decided that the claimants could enter their claims to the lots.

To each of these affidavits, it is stated that the land since April, 1837, has been in his possession, and that of his brother, until about the 2d of August, 1842, when the claimant entered and settled upon the lot claimed by him; to which settlement the affiant gave his consent.

In February, 1843, patents were issued in favor of each of these preëmptors, and the titles of the three were transferred to *McKiernan*, by acts of sale passed in February, 1845. The sale of *Greisham* was for $4,500 cash, of *Bartlett* for $1,500, and *Burney*, for $5,000, both cash.

This outstanding title is at length centered in *McKiernan*, and what is his relation to *Dunlap?* That of brother-in-law—a man with whom he had been always very intimate—his partner in the law business, to whom he had lent his name, as *McKiernan* was not a licensed attorney, and who, with *Greisham*, ate every day, at the period of these doings, at his table, and kept his law office in *Greisham's* house.

*Greisham* was the overseer of *Dunlap*, from 1839 till his death, and at this time had the custody of the whole property, as the keeper of the sheriff under a formal appointment of that officer, and a written acceptance on his part.

*Bartlett*, who entered lot No. 2, was the overseer of *Dunlap's* father-in-law. *McKiernan* told him that this section, 22, was public land and could only be entered by preëmption, and that *Dunlap* preferred his friends should enter it, rather than any one else; and, in consequence of what *McKiernan* told him, he settled on a quarter of the section. *McKiernan* then offered to pay the entry money for him, as he owed him. He gave him the money which was deposited at the land office. In his settlement with *McKiernan, this money was not charged.* He received no rent, nor any part of cotton and corn grown on the lot in 1842 and 1843. He transferred the land to *McKiernan* for his note for $1500. He cannot tell when this was done. Nothing has been paid on the note, and his other answers indicate that the transaction, so far as he was concerned, had no reality or consideration.

The other preëmptor, *Burney*, though attached as a witness on the trial of the cause in 1848, positively refused to attend court. From which may be fairly inferred an aversion on his part to testify.

It appears also in evidence, that on the second of June, 1842, *McKiernan* instituted suit against *Dunlap*, for the recovery of a portion of the property acquired by *R. G. Dunlap* from the plaintiffs, in the name of *Joseph M. Looney*, in his own right and as tutor of his minor son, belonging to them, as alleged, by right of inheritance from *Cicero Jefferson.* It seems that *McKiernan's* professional relations with his client, continued as late as April, 1848.

This party has placed himself in such a position before the court, that he can only be saved from the predicament of attempting to defeat the interests of his own client, by averring that he acted in these matters for the sole purpose of securing *Dunlap's* title, and thus enable his doings to inure to the benefit of his client.

In November, 1851, *Looney* joined the plaintiffs in their suit, thereby affirming the sale to *R. G. Dunlap*, and the case need not be embarrassed by any questions arising from his rights.

It is proved, that after this pretended eviction in August, 1842, *Dunlap* erected his plantation buildings and made permanent improvements in this section; nor have we been referred to any evidence which establishes any change of profession during the lifetime of *Dunlap.* The land was cultivated as usual since 1839, and had no ostensible possessor except *Dunlap.* There was no

PEPPER,
*v.*
DUNLAP.

rent exacted or paid for the use of the land. The payment of rent, under the advice of counsel, by the executrix of *Dunlap* in 1849 and since, subsequent to taking the appeal to this court, in which this cause was last remanded, makes no change in relation to rights asserted previous to that period, and then in litigation. Parties are not permitted to defeat rights in this condition, by collusion or agreements between themselves.

Having thus the facts before us—the purpose averred by *Copley*, and the plan intimated by him, and executed by him at Monroe, and the want of any real change of possession, what can be the action of a court of justice on them, except to take no heed of so shallow an artifice? *Gillespie* v. *Cammack*, 3 Ann. 249.

One of the rights of possessors is, that they are considered as owners of the things they possess, and in all cases where the object sold remains in the possession of the seller, because he has reserved to himself the usufruct, or retains possession by a precarious title, there is reason to presume that the sale is simulated, and with respect to third persons, the parties must produce proof that they are acting in good faith, and establish the reality of the sale. Code 2456, 1915. Vide cases under these articles collected in 2d Hennen's Digest, 1394, verbo *Sale* III, 6, 5, 9.

This principle does not relate exclusively to the contract of sale, but to all divestitures of ownership and possession. It is plain that no possession has ever been acquired adverse to the plaintiffs' title, on the contrary there has been no possession except under it.

Reliance has been placed in argument on a declaration made by *James Pepper*, in a conversation had with *Lafayette Jones*, concerning a proposition to compromise. This witness was examined in November 1850, and the conversation took place in 1843. We do not think the time of the year is fixed by the deposition of the witness. The time could have been ascertained and a party can derive no advantage from leaving evidence in a condition of uncertainty as to time, when that uncertainty could easily have been removed. Communications between parties for compromise in the attitude of hostility in which these litigants had placed themselves, ought to be in writing, if they are to have the effect of notice or putting in default. What passed verbally between the witness and *Pepper*, can only have effect as an admission; the weakest kind of evidence, and, at the distance of time in this instance, not sufficiently reliable to control or direct the action of a court.

This case was tried before a jury in November, 1851, who were unable to agree in a verdict. It was submitted to a jury in April, 1852, who found a verdict for the defendants, from the judgment on which the present appeal is taken.

When the case was before us, we stated the law applicable to it to be, that if the vendee buys up a better title than that of the vendor, and the vendor was guilty of no fraud, he can only be compelled to refund to the vendee the amount of the money paid for the better title. The plaintiffs were entitled to a reasonable time to perfect the title, and the defendants have no ground to complain of the delay in this respect, as they undertook, of themselves, to defeat the plaintiffs' title, and did not put them in default.

Our conclusion is, that the title acquired by *McKiernan*, was obtained under such circumstances, that it inures to the benefit of the vendors. Indeed, that the whole affair, from beginning to end, is a mere sham, for the purpose of defeating the payment to the plaintiffs, as averred by the agent of all the parties.

We think that the plaintiffs are chargeable with the preemption price of PEPPER, the land and the amount of the payment to *Reynolds, Marshall & Co.* ; for the v. balance, they are entitled to judgment. DUNLAP.

We have come to the conclusion, that the case is clearly with the plaintiffs on the evidence, and have less reluctance in setting aside this verdict, from the fact that we think the judge ought to have charged the jury on some points, as asked by the counsel for the plaintiffs. As the case is now closed, it is unnecessary to review the instructions asked for.

It is therefore ordered, adjudged and decreed, that the judgment of the court below be reversed : and that the injunction granted to *Hugh W. Dunlap*, as curator of the succession of *Richard G. Dunlap*, be dissolved without damages. It is further ordered and decreed, that there be judgment in favor of the appellants for the sum of $30,732 16, with five per cent per annum interest upon $6,132 16, from the 4th of March, 1839, till paid ; and a like interest upon $6,160 from the first of March, 1840, till paid ; and a like interest upon $6,160, from the 1st of March, 1841, till paid ; and a like interest upon $6,160 from the 1st of March, 1842, till paid ; and a like interest upon $6,160, from the 1st of March, 1843, till paid ; and for all costs of suit, subject, however, to a credit of $803 67, to be made upon the interest alone, with the vendor's privilege and mortgage upon the land known and described as sections 22, 23, 24, 25, 52, 53, and lot No. 3 of section 54, in township No. 16, North of range 14 East, and the following eighteen slaves, to wit : *Jim, Isham, Clem, Bob, Sil, Sylvia, Jacob, Nelson, Henry, Old Jacob, Henry, Rachel, Peggy, Caroline, Louisa, Alsey, Saul* and *Anthony*, all of which land and slaves are described in the act of sale from *James Pepper et als.* to *R. G. Dunlap*, annexed to the petition. And it is further ordered and decreed, that on the claim set up by *McKiernan*, to the ownership of the said section 22, judgment be rendered for the plaintiffs, with costs ; and that the appellees pay costs in both courts.

Rehearing refused.